[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 09-15563
_____

D. C. Docket No. 09-00023-CV-JTC-3



FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 30, 2010
JOHN LEY
CLERK

OSMOSE, INC.,

Plaintiff-
Counter Defendant-
Appellee,

TIMBER PRODUCTS INSPECTION, INC.,

Plaintiff,

versus

VIANCE, LLC,
ROCKWOOD HOLDINGS, INC.,
STEPHEN B. AINSCOUGH,
a.k.a. Steve Ainscough,
SEIFOLLAH E. GHASEMI,
a.k.a. Seifi Ghasemi,
CHRISTOPHER R. SHADDAY,
a.k.a. Chris Shadday,

Defendants-Counter-
Claimants-Appellants,

versus

PAUL GOYDAN,

Cross-Defendant-
Counter-Defendant,

STEPHEN C. REEDER, et al.,

Counter-Defendants.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(July 30, 2010)

Before BLACK, HULL and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

This appeal concerns a preliminary injunction entered in a false advertising

case under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Viance, LLC

("Viance") released several advertising statements expressing serious safety

concerns regarding the use of wood treated with Osmose, Inc.'s ("Osmose")

copper-based wood preservative called MCQ.[1] In response to these

---

[1] Osmose and Viance both named several officers and employees of the other as defendants or counter-defendants in their respective claims and counterclaims. We will refer to the parties as Osmose and Viance.

advertisements, Osmose brought this suit against Viance, alleging that the advertisements constituted false advertising in violation of § 43(a) of the Lanham Act and various state laws because certain studies performed by Viance did not support the broad safety concerns raised in the advertisements. Viance responded in kind via counterclaims, alleging that Osmose had engaged in false advertising of its own by releasing advertisements that inaccurately bolstered its MCQ product. Each side moved for a preliminary injunction. After a lengthy hearing, the district court granted Osmose's motion for a preliminary injunction against Viance, but denied Viance's motion for a preliminary injunction against Osmose. Viance appeals only the entry of injunctive relief against it. After careful review, we affirm in part, vacate one provision of the injunction and remand the balance with instruction that it be modified to remove any First Amendment concerns.

## I. BACKGROUND

Viance and Osmose are competitors in the wood preservative market. Each develops, manufactures, and sells preservatives used to protect wood against rot, decay, and insect attack. Both companies sell copper-based wood preservatives, but the products differ in how the copper is introduced in the wood. Viance manufactures and sells a preservative called ACQ, which stands for alkaline copper quaternary. In ACQ, copper is solubilized in a solution. Throughout the

early part of this decade, ACQ was the dominant product in the market. At that time, Osmose used the technology in its own products under a license from Viance.

In the early 2000s, Osmose also began to develop a new technology that used micronized copper suspended in solution, instead of solubilized copper as used in ACQ. Osmose trademarked this technology and markets it as MicroPro. Osmose used the MicroPro technology to create a wood preservative to compete with ACQ. It called this new preservative MCQ, which stands for micronized copper quaternary. Osmose began marketing its MCQ product in early 2006. Osmose has obtained certification from the ICC Evaluation Service – an association that issues evaluation reports for building products and material to determine whether they comply with model building codes – for its MCQ product, but MCQ has not been certified by the America Wood Protection Association (AWPA). Viance's ACQ is approved by both organizations. The development of MCQ has eaten into ACQ's share of the wood preservative market.

After the introduction of MCQ into the market, Viance began testing the efficacy of MCQ.

A. Viance's Testing

      1. SEM Testing

Viance's first step was to purchase commercially available MCQ-treated wood and send it to a lab to be analyzed using a scanning electron microscope (SEM). Viance theorized that, unlike the soluble copper ions found in ACQ, the suspended micronized copper particles found in MCQ might not penetrate the wood in sufficient quantities to provide the necessary protection against microorganisms that produce soft rot. It sought to verify this concern through SEM testing. According to Viance, the SEM results verified its doubts because the studies showed insufficient penetration of copper into the cell walls and a concentration of copper in the cell walls of MCQ-treated wood that was significantly lower than ACQ-treated wood. Dr. Kevin Archer of Viance presented the findings at the 2007 International Research Group on Wood Protection conference. In his presentation, Dr. Archer concluded that the copper concentration in the cell walls of MCQ-treated wood was significantly lower than in wood treated with ACQ but that the long term performance implications in ground contact were unknown. Dr. Archer did not produce a paper describing the methods and results of the SEM tests in conjunction with his presentation.

2. Field Stake Testing

Viance then undertook field stake tests on MCQ-treated wood. Field stake tests are an accepted method of testing the effectiveness of a wood preservative.

In the tests, stakes are treated with preservative and placed in the soil. The stakes are then evaluated periodically for decay. Stakes treated with the preservative being tested are often measured against untreated stakes and stakes treated with a proven preservative to evaluate the tested preservative's relative performance. The tests performed by Viance began in April and May of 2007 in Hilo, Hawaii, and Tanegashima, Japan. For these particular tests, Viance bought commercially available square posts treated with either ACQ or MCQ and cut stakes from the corners of each.[2] Viance hired Dr. Darrel Nicholas, a wood scientist at Mississippi State University, to inspect and rate the stakes. He concluded that MCQ stakes were "performing poorly" and that "it is apparent that the MCQ formulation is not performing in ground contact as would be expected for a commercial wood preservative." He qualified his findings, however, by noting that additional data would be required to confirm his concern about the performance of MCQ-treated products. Dr. Nicholas has not inspected the stakes since his initial inspection.

3. In-Service Testing

---

[2]     By using this technique, two sides of each stake were treated and two untreated. The district court noted that Viance did not field coat the untreated sides of the stakes.

Osmose argues that Viance did not follow the AWPA's E7 protocol for field stake tests because Viance used pre-treated wood and cut non-standard stake sizes. Viance does not dispute that it did not strictly follow the E7 protocol. It argues that any deviations were immaterial because its advertisements do not state that it used the E7 protocol and because the deviations from the protocol do not undermine the results of the test.

Viance then conducted an in-service survey of MCQ-treated wood. Viance hired a private investigation firm to search central Florida for in-use MCQ-treated posts showing signs of decay. In July 2008, that firm prepared a report noting that it had visited eighteen sites and interviewed numerous retailers and builders and that none had experienced or heard of any problems regarding premature decay in MCQ-treated products.

Viance continued to search. In November 2008, it discovered posts allegedly showing premature decay in Baton Rouge, Louisiana. Viance hired Timber Products Inspection, Inc. ("Timber Products"), an independent company that inspects and tests wood products, to test the eleven posts removed from the Baton Rouge site. Viance chose the posts to extract. Timber Products rated the posts on the AWPA's E7 scale, a 10 point scale of soundness in which 10 represents sound wood and 0 represents total failure.[3] On November 14, 2008, Timber Products issued a report ("November 2008 TP Report") in which it rated

_____

[3] The score is based on a subjective determination of the degree of decay of the wood. The rating scale is as follows: 10 - Sound, no sign or evidence of decay, wood softening or discoloration caused by microorganism attack; 9.5 - Trace-suspect, some areas of discoloration and/or softening associated with superficial microorganism attack; 9 - Slight attack, decay and wood softening is present, up to 3% of the cross sectional area is affected; 8 - Moderate attack, similar to 9 but more extensive attack with 3-10% of cross sectional area affected; 7 - Moderate/severe attack, sample has between 10-30% of cross sectional are decayed; 6 - Severe attack, sample has between 30-50% of cross sectional area decayed; 4 - Very severe attack, sample has between 50-75% of cross-sectional are decayed; 0 - Failure, sample has functionally failed.

all eleven MCQ posts removed from the Louisiana site as a 9 or 9.5 on the scale. Timber Products also noted that its report should not be considered as acceptance or rejection for the grade, treatment or physical quality of the tested material.

Sometime in late 2008 or early 2009, Viance discovered posts allegedly showing signs of premature decay in Alpharetta, Georgia. The posts were allegedly installed in September or October of 2007. Viance selected forty-five posts and had Timber Products assign them a visual rating. Timber Products also took fourteen of the forty-five posts and subjected them to a more thorough investigation. On January 21, 2009, Timber Products released another report summarizing its findings ("January 2009 TP Report"). Of the forty-five posts visually inspected, twenty-six posts rated a 10, eleven rated a 9.5, five rated a 9, two rated an 8, and one rated a 7. Of the fourteen posts subjected to further examination, four posts rated a 10, five posts rated a 9.5, two posts rated a 9, two posts rated an 8, and one post rated a 7. The January 2009 TP Report contained the same disclaimer that the report should not be considered as acceptance or rejection for the grade, treatment or physical quality of the tested material.

Over the course of its search, Viance estimates that it inspected roughly 800 posts, two-thirds of which were treated with MCQ. Thus, they investigated roughly 530 MCQ-treated posts.

B. Viance's Advertisements

After receiving the Timber Products Reports, Viance issued two press releases titled: "Decaying 4x4 Posts Confirm Performance Concerns with Micronized Copper Wood Preservatives" and "Hidden Danger in Your Backyard." The press releases contained various statements related to both its testing and safety concerns regarding the use of MCQ-treated wood. For instance, one release begins by stating: "Viance has uncovered evidence that micronized copper quaternary (MCQ™) preservative has failed to prevent decay of 4x4 wood posts at several subdivisions in the southeastern United States." Another release begins: "Findings on 4x4 posts at residential locations reveal dramatic evidence that wood treated with micronized copper preservative (MCQ™) is decaying more rapidly than anticipated." The releases go on to reference Timber Products' role in the testing. The releases also contain statements raising concerns about the safety of MCQ-treated posts. For instance, the first states: "The decay, verified by Timber Products Inspection (TPI), is considered unacceptable for providing long-term structural integrity for residential and commercial uses" and " . . . the severity of the decay on these micronized copper-treated posts raises alarming consumer safety concerns about structures built using micronized copper treated wood." The second states: "These decay findings raise serious concerns about the structural

9

integrity and safety of outdoor structures, such as decks and fencing, built with micronized copper preservative within the last three years." Viance also sent an email with the subject line "Is a Treated Wood Lawsuit in Your Future?" containing the statement: "the safety of your customers and clients is at stake if your projects' support structures are being built with Micronized treated wood that cannot adequately resist decay."

C. Response to Viance's Advertisements

Viance's advertisements prompted responses from multiple parties. Osmose published its own press release criticizing Viance's studies. Timber Products also issued a press release clarifying its role in the Viance study and the limitations of its report. Timber Products noted: (1) that it tested only the posts that Viance directed it to test and that it did not identify a random sampling for testing, (2) that there was a subjective element in rating the posts, (3) that no comparable study existed for other preservatives, (4) that it was an independent agency retained by Viance and did not advocate for any particular preservative, and (5) that it hoped the information in its clarification would preclude interested parties from using the Report to make generalizations that may not be supported by the Report. A group of members of the pressure-treated lumber community also banded together and issued a release and a letter to Viance asking it to abandon its campaign.

10

D. Lawsuit

On March 3, 2009, Osmose filed a complaint against Viance and several of its officers and employees alleging false advertising under § 43(a) of the Lanham Act and various related false advertising claims under Georgia law. In addition to monetary damages, Osmose sought preliminary and permanent injunctive relief enjoining Viance from making false or misleading statements critical of MicroPro technology, MCQ, or other micronized copper wood preservative systems. At that time, Osmose also sought a temporary restraining order ("TRO"). The district court granted the motion for the TRO on March 20, 2009.

On April 3, 2009, Viance filed both an answer denying the allegations of the complaint and counterclaims against Osmose and several of its officers and employees asserting false advertising claims under § 43(a) of the Lanham Act and various related claims under Georgia law. Viance sought money damages and preliminary and permanent injunctive relief enjoining Osmose from making false or misleading statements to bolster its micronized copper products. On April 14, 2009, Viance also filed a motion for a TRO. The district court denied that motion on April 21, 2009.

The district court held a hearing on both parties' motions for a preliminary injunction from June 24, 2009, to July 2, 2009. In an Order issued on September

11

29, 2009, the district court granted Osmose's motion for a preliminary injunction and denied Viance's motion for the same. The injunction contains the following specific provisions:

1. Defendants <u>may</u> publish the results of the in-service survey performed by Viance and the field stake tests conducted in Hawaii and Japan.

2. Defendants are enjoined, however, from claiming or implying that those studies demonstrate that structures built using micronized copper-treated wood are unsafe, pose a threat to consumers, or are structurally unsound.

3. Defendants are enjoined from claiming or implying that the studies demonstrate that micronized copper preservatives are defective in general or are less effective than solubalized copper preservatives.

4. Defendants <u>may not</u> draw their own conclusions about what the studies indicate and then attribute those conclusions to the studies themselves unless the data in the studies clearly support such conclusions. Any conclusions attributed to the studies must be stated in the studies themselves or must be readily apparent from the data contained in the studies.

5. Defendants <u>may not</u> indicate or imply that any conclusions or opinions stated in their advertisements concerning the effectiveness of micronized copper preservatives or the safety of structures built with micronized copper-treated wood are verified or endorsed by Timber Products.

6. Defendants <u>may not</u> claim or imply that Osmose's MicroPro process was not certified as EPP by SCS, or that SCS did not consider life cycle analysis including efficacy analysis in awarding EPP certification to Osmose's MicroPro process.

Viance timely appealed the preliminary injunction entered against it.[4]

## II. STANDARD OF REVIEW

A district court's grant of a preliminary injunction is reviewed for an abuse of discretion.  N. Am. Med. Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1216 (11th Cir. 2008).  The district court's findings of fact are reviewed under a clearly erroneous standard.  Id.  A finding of fact is clearly erroneous only when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  Id. (internal quotation marks omitted).  The district court's conclusions of law are reviewed de novo, "understanding that application of an improper legal standard . . . is never within a district court's discretion."  Id. (internal quotation marks and brackets omitted).

## III. DISCUSSION

"[A] district court may grant a preliminary injunction only if the movant establishes the following: (1) a substantial likelihood of success on the merits of the underlying case, (2) the movant will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant in the absence of an injunction

---

[4]    Viance does not appeal the district court's decision to deny its own motion for a preliminary injunction.

would exceed the harm suffered by the opposing party if the injunction issued, and (4) an injunction would not disserve the public interest." Id. at 1217 (internal quotation marks omitted). Viance argues that the district court erred in several respects. First, Viance argues the district court clearly erred in concluding that Osmose had demonstrated a substantial likelihood of success because its advertisements were not literally false. Second, Viance argues that the district court abused its discretion by entering injunctive relief against it on a point on which it had requested injunctive relief against Osmose. Third, Viance argues that the district court abused its discretion in concluding that the balance of the preliminary injunction factors weighed in favor of granting injunctive relief. Finally, Viance argues that the terms of the preliminary injunction violate the First Amendment because it is not restricted to commercial advertising or promotional statements.[5]

A. Likelihood of Success

Section 43(a) of the Lanham Act provides, in relevant part, as follows:

---

[5] Of course, we address only the particular arguments raised on appeal by Viance, and we express no opinion on other arguments which might have been asserted. For example, in rebuttal at oral argument, Viance argued for the first time that the language of the injunction was overbroad in that it enjoined not only false claims, but also implications (which it argued might be ambiguous and thus not literally false but merely misleading). We decline to entertain that belated argument.

14

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-

...

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

In order to establish the requisite likelihood of success on a false advertising claim, the movant must establish that: "(1) the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) the movant has been–or is likely to be–injured as a result of the false advertising." Axiom Worldwide, 522 F.3d at 1224 (internal quotation marks omitted).

1. Literal Falsity of Statements Regarding MCQ

The first element of a false advertising claim is "satisfied if the challenged advertisement is literally false, or if the challenged advertisement is literally true,

15

but misleading." Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1247 (11th Cir. 2002). When determining whether an advertisement is literally false or misleading, courts "must analyze the message conveyed in full context," and "must view the face of the statement in its entirety . . . ." Id. at 1248 (internal quotation marks and citations omitted). The distinction between literally false and merely misleading statements is often a "fine line." Axiom Worldwide, 522 F.3d at 1225. The ambiguity of the statement at issue, or the lack thereof, is significant. Statements that have an unambiguous meaning, either facially or considered in context, may be classified as literally false. United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1180 (8th Cir. 1996). As the meaning of a statement becomes less clear, however, and it becomes susceptible to multiple meanings, the statement is more likely to be merely misleading. Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 158 (2d Cir. 2007) ("[I]f the language or graphic is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false."); see also Clorox, 140 F.3d at 180 (stating that as claims become more attenuated or suggestive they are less susceptible to a literally false characterization). Literal falsity is a finding of fact reviewed for clear error. Axiom Worldwide, 522 F.3d at 1225 n.12.

a. Meaning of the Statements

16

The district court construed the various statements in the advertisements as "tests prove" or "establishment" claims, placing the burden on Osmose to demonstrate that Viance's tests do not establish the proposition for which they are cited. In 1-800 Contacts, we explained that the "plaintiff's burden in proving an advertisement to be literally false should depend on whether the defendant's advertisement cites consumer testing." 299 F.3d at 1248 (citing C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare L.P., 131 F.3d 430, 435 (4th Cir. 1997); Rhone-Poulenc Rorer Pharms. Inc. v. Marion Merrell Dow, Inc., 93 F.3d 511, 514-15 (8th Cir. 1996); Castrol, Inc. v. Quaker State Corp., 977 F.2d 57, 62 (2d Cir. 1992)).[6] Advertising that cites such testing is classified as an "establishment" claim. Id. In order to prove the literal falsity of such a claim, the

_____

[6] Although we referenced consumer testing specifically in 1-800 Contacts, the cases we cited make clear that a statement citing a scientific or validating test constitutes a "tests prove" or "establishment" claim. See C.B. Fleet, 131 F.3d at 435 ("When an advertising claim of favorable fact either expressly or impliedly asserts that the fact is testor study-validated, the fact of the validation becomes an integral and critical part of the claim. Such a claim may therefore be proven literally false by showing only that the test asserted to validate it did not in fact do so."); Rhone-Poulenc, 93 F.3d at 514-15 (holding that "where defendant has hyped the claim of superiority by attributing it to the results of scientific testing, plaintiff must prove only that the tests [relied upon] were not sufficiently reliable to permit one to conclude with reasonable certainty that they established the proposition for which they were cited" (alteration in original) (internal quotation marks omitted)); Quaker State, 977 F.2d at 63 (holding that when "defendant's ad explicitly or implicitly represents that tests or studies prove its product superior, plaintiff satisfies its burden by showing that the tests did not establish the proposition for which they were cited").

17

plaintiff must prove only that the tests did not establish the proposition for which they were cited.  Id.

In concluding that Viance's advertising claims were "tests prove" or "establishment" claims, the district court specifically cited the following statements from the press releases:

> [T]he severity of the decay on these micronized copper-treated posts raises alarming consumer safety concerns about structures built using micronized copper treated wood.  (Def. Ex. 13.)

> Viance . . . is concerned that decay occurring this early in the service life of wood poses a substantial safety hazard to consumers with structures built from micronized copper-treatedwood.  (Id. at 2.)

> These findings provide evidence that micronized copper-treated wood is prone to premature decay, and Viance believes that its continued use raises serious consumer safety concerns.  (Id.)

> These decay findings raise serious concerns about the structural integrity and safety of outdoor structures, such as decks and fencing, built with micronized copper preservatives within the last three years.  (Def. Ex. 232.)

> We are very concerned about the safety of possibly millions of consumers whose decks and other structures were built with micronized copper-treated wood because the wood may be subject to early failure and possible collapse[.]  (Id.)

and the following statements from the email:

> The safety of your customers and clients is at stake if your projects' support structures are being built with Micronized treated wood that cannot adequately resist decay.  (Def. Ex. 271.)

Our findings show that micronized copper-treated wood will lead to problems with structural integrity. (Id.)

We are concerned that micronized copper wood preservative systems fail to prevent decay and termite attack, thereby compromising the dependability of the wood used to build support structures. In the case of raised decks, this poses a considerable safety hazard as deck supports we believe will fail. (Id.)

We agree with the district court's classification of Viance's statements as "tests prove" or "establishment" claims. The references to "findings" or "decay findings" clearly refer to the results of Viance's testing as captured in the field stake tests and, most particularly, the Timber Products Reports. The statements then use those findings as support for conclusions regarding the safety and efficacy of MCQ or structures built using MCQ-treated posts. Thus, the district court did not clearly err in classifying these statements as "establishment" claims. Because the advertising statements were "tests prove" or "establishment" claims, the burden of proof on Osmose was only to demonstrate that the field stake tests and the in-service survey results captured in the Timber Products Reports do not support the conclusions Viance draws with regards to the safety and efficacy of MCQ. See, e.g., Quaker State, 977 F.2d at 62-63. In other words, Osmose, as a plaintiff challenging "tests prove" or "establishment" claims, does not have to

19

affirmatively prove that Viance's safety concerns are false; rather, Osmose has to prove only that Viance's tests do not support Viance's conclusions.

Viance contends that most of these advertising statements are a combination of factual statements, which it contends are truthful, and non-actionable statements of opinion. For instance, it points to the statement: "These findings provide evidence that micronized copper-treated wood is prone to premature decay, and Viance believes that its continued use raises serious consumer safety concerns." It argues that this statement is composed of two assertions. First, the assertion that the findings show premature decay, which it argues is literally true. And second, the assertion that Viance believes the use of micronized-copper treated wood raises serious safety concerns, which it argues is a non-actionable opinion.[7] For

---

[7] Viance contends several other statements follow this pattern:

"Viance . . . is concerned that decay occurring this early in the service life of wood poses a substantial safety hazard to consumers with structures built from micronized copper-treated wood.

"We are very concerned about the safety of possibly millions of consumers whose decks and other structures were built with micronized copper-treated wood because the wood may be subject to early failure and possible collapse."

"We are concerned that micronized copper wood preservative systems fail to prevent decay and termite attack, thereby compromising the dependability of the wood used to build support structures. In the case of raised decks, this poses a considerable safety hazard as deck supports we believe will fail."

20

several reasons, Viance's argument does not persuade us that the district court clearly erred in determining these statements were literally false.

Even taken in isolation, Viance's purported statements of opinion might be reasonably interpreted as being more than a simple statement of opinion. Statements of opinion are generally not actionable. See, e.g., Pizza Hut, Inc. v. Papa John's Int'l, Inc., 227 F.3d 489, 496 (5th Cir. 2000) ("Bald assertions of superiority or general statements of opinion cannot form the basis of Lanham Act liability."). But Viance's statements regarding serious safety concerns arguably could be construed as more than general statements of opinion. Representations that the use of a particular product "poses a considerable safety hazard" because of a risk of failure or that structures built with micronized copper-treated wood might be at risk "because the wood may be subject to early failure and possible collapse" arguably are reasonably interpreted as more than subjective statements regarding the efficacy or superiority of a product. Instead, they can be viewed as expressing an objective risk of serious consequences that fairly implies a basis for that statement. See Restatement of Unfair Competition § 3 cmt. d. (1995) ("Some representations of opinion may imply the existence of facts that justify the opinion . . . ."). Viance cites Pizza Hut for the proposition that a statement is one of fact if it "(1) admits of being adjudged true or false in a way that (2) admits of empirical

21

verification." 227 F.3d at 496 (internal quotation marks omitted). In this case, the proposition of serious safety risks because of premature failure of MCQ-treated wood arguably is one that could be judged true or false based on empirical testing of the product. Viance, in fact, attempted to undertake that testing in its field stake tests and in-service surveys.

But we need not decide whether these purported statements of opinion – viewed in isolation – are actionable because the context in which these statements appear makes it clear that the district court reasonably interpreted these statements as making unambiguous "establishment" or "tests prove" claims. This Court has recognized the importance of context when analyzing false advertising claims. See 1-800 Contacts, 299 F.3d at 1248 ("It is true that a court must analyze the message conveyed in full context, and that the court must view the face of the statement in its entirety, rather than examining the eyes, nose, and mouth separately and in isolation from each other." (citation and internal quotation marks omitted)); see also Clorox, 140 F.3d at 1180 ("In assessing whether an advertisement is literally false, a court must analyze the message conveyed within its full context."); Avis Rent A Car Sys., Inc. v. Hertz Corp., 782 F.2d 381, 385-86 (2d Cir. 1986) (discussing the importance of context and viewing the advertisement in its entirety when determining literal falsity). Viance's purported

statements of opinion regarding serious safety concerns were generally made in the same sentence as a reference to its "findings" or "decay findings," which referred to the field stake tests and, most particularly, the in-service survey results described in the Timber Products Reports. And when its statements of opinion were not located in the same sentence as a reference to the findings, reference to the findings can be found in the closely surrounding text. Viewing the "entire mosaic," Avis, 782 F.2d at 385 (internal quotation marks omitted), the references to the decay findings were linked to the expressions of safety concerns in a way that clearly indicated that the findings were the basis of and support for the expressions of safety concerns. See Castrol Inc. v. Pennzoil Co., 987 F.2d 939, 946 (3d Cir. 1993) (finding claims actionable when defendant sought "to substantiate its claims of superiority by reference to testing").

Beyond that, there are several statements that are not even fairly subject to the sort of parsing that Viance proposes. For instance, one advertisement states that: "[T]he severity of the decay on these micronized copper-treated posts raises alarming consumer safety concerns about structures built using micronized copper treated wood." The other states that: "These decay findings raise serious concerns about the structural integrity and safety of outdoor structures, such as decks and fencing, built with micronized copper preservatives within the last three years."

23

And the email states that: "Our findings show that micronized copper-treated wood will lead to problems with structural integrity." None of these statements express anything arguably in the form of an opinion. Instead, they directly link the findings from Viance's studies to problems with MCQ or concerns for the structural integrity and safety of MCQ-treated wood and structures built from it. On their face, these statements are unambiguous "establishment" claims. And given that the statements that Viance seeks to classify as a mixture of fact and non-actionable opinion were intimately linked with these non-parsable statements, the district court did not clearly err in determining that the foregoing statements made unambiguous "establishment" claims.

In sum, we cannot conclude that the district court was clearly erroneous in its findings as to the meaning of Viance's statements. The district court was not clearly erroneous in finding that the claims were "establishment" claims unambiguously asserting that the tests supported the structural integrity and safety concerns expressed in the advertisements.

b. Evidence in Support of the District Court's Factual Findings

Having determined the meaning of the statements, we turn to the district court's finding that the statements were literally false because Viance's broad conclusions concerning the safety of structures built with MCQ-treated wood were

not adequately supported by Viance's field stake and in-service tests. The district court gave three particular bases for its finding. First, Viance drew broad conclusions about the safety of structures built with MCQ-treated wood, but it never inspected structures built with MCQ-treated wood. Instead, it only inspected fence posts and lot markers in its in-service survey and stakes in its field stake test. Second, Viance had to go to considerable trouble to find any posts showing decay in its in-service survey, and ultimately only found that thirteen of the 530 MCQ-treated posts it inspected were rated a 9.0 or lower. The district court concluded that such a low percentage did not support broad generalizations about the integrity or safety of structures built with MCQ-treated wood. Third, the reports by the inspecting parties on the in-service survey and field stake tests were subject to qualification. Relative to the in-service survey, Timber Products specifically qualified its reports as not providing the basis for any conclusion as to the grade, treatment, or physical quality of MCQ treated posts. Todd Greer, Vice-President of Timber Products, also made several statements qualifying the findings in the Reports. And in connection with the field stake tests, Dr. Nicholas qualified his concerns by noting that additional data would be required to confirm concerns about the performance of MCQ in ground-contact applications. Yet Dr. Nicholas never inspected the stakes after his initial inspection, nor did he know if Viance

had either.  In light of those considerations, the district court concluded that the tests did not support broad conclusions about the safety of structures built with MCQ-treated wood.  We examine in turn these three grounds for the district court's finding.

### i. Testing of Fence Posts and Stakes

Viance first attacks the district court's reliance on the fact that Viance tested only fence posts and stakes, but not structures.  Viance does not dispute that it did not test structures built with MCQ-treated wood, but does dispute the conclusion (which it attributes to the district court) that tests on stakes and fence posts are not sufficient to form conclusions as to the safety of structures built with MCQ-treated wood.  In support of its argument, Viance cites to testimony establishing that the posts tested in the in-service survey are the exact type of posts used to build structures and that what matters is testing wood in ground contact, not the specific use of the wood prior to the testing.  Viance also points to testimony establishing that field stake testing is a standard industry method for testing the efficacy of wood preservatives.

The district court did not fully explain why Viance's testing of fence posts and stakes could not support safety concerns regarding structures built with MCQ-treated wood.  We see two possible interpretations of this first rationale of the

26

district court. The district court may have meant that the particular tests performed did not purport to indicate that the decay revealed was indicative of the structural weakness and safety concerns expressed in Viance's advertisements. As the district court said in this regard: "Viance did not test the effect of the alleged decay on the integrity of structures built with MCQ treated wood." To the extent this was the reasoning of the district court, it is not clearly erroneous.[8] In fact, evidence indicates that Viance's tests did not assess the effect of the alleged decay on the structural integrity of the wood. As thus understood, the district court appropriately relied on the fact that Viance's tests did not support the broad conclusions regarding the structural integrity and safety of MCQ-treated wood expressed in Viance's advertisements. We adopt the foregoing construction of the district court's reasoning and conclude that the district court did not clearly err in

---

[8]     The district court's reasoning on this point is supported by certain evidence in the record. Chris Barber, laboratory manager at Timber Products, testified in his deposition that there is an AWPA standard test for the structural strength of a post, that he was never asked to perform that test on the posts in question, and that the rating of decay at a particular moment on a post does not indicate the structural strength of a post. And Todd Greer, Vice-President of Timber Products, stated in his declaration that "[a] claim or suggestion that properly treated outdoor structures built with micronized copper wood may be unsafe or may prematurely fail in service is not warranted by any of the findings contained in either of these reports." This testimony does support the district court's finding that Viance's tests did not support the broad conclusions about structural integrity and safety asserted in Viance's advertisements.

finding that the tests performed did not support Viance's conclusions regarding the safety and efficacy of MCQ.[9]

### ii. District Court's Analysis of the Results of the In-Service Survey

The district court found thirteen of the 530 posts examined showed decay at a rating of 9.0 or below. The district court thus found that only 2.45% of the posts showed significant decay, a percentage the district court found was too low to support serious concerns regarding the structural integrity and safety of MCQ-treated wood. Viance attacks the district court's calculations as to the percentage of posts that showed decay and its conclusion that such a low percentage did not support serious safety concerns. Viance contends that although it saw roughly 530 MCQ-treated posts in its in-service survey, it did not analyze all 530 of them. Thus, Viance argues that using 530 as the baseline for the percentage that showed decay was error. It also claims that the district court's finding that thirteen of the posts were rated 9.0 or less also is not supported by the record. That being the case, Viance argues that the district court's conclusion that 2.45% of the posts

---

[9] The other possible interpretation of the district court's language is that the district court may have concluded that tests on fence posts and stakes could not support Viance's concerns about the safety of structures built with MCQ-treated wood because tests on stakes or in-service fence posts can never contribute to a conclusion as to the safety of structures built with MCQ-treated wood. Viance cites testimony indicating that such reasoning may well be clearly erroneous. However, as we do not interpret the district court as having adopted that reasoning, we need not decide that question. In any event, the other two bases cited by the district court provide strong support for its ultimate conclusion as to literal falsity.

showed decay is not supported by the record. Viance suggests that an appropriate analysis shows that of the fifty-six total posts analyzed by Timber Products, nineteen of the Georgia posts analyzed rated 9.5 or lower and eleven of the Louisiana posts rated 9.5 or lower; therefore, roughly 54% of the posts showed decay, a percentage sufficient to support serious safety concerns.

The district court's reasoning on this point has four components: the threshold rating at which a post should be counted as having significant decay, the number of posts decayed under that standard, the number of posts comprising the total sample, and whether the resulting percentage of decayed posts supports a conclusion of serious safety concerns.

Although Viance never clearly challenges the district court's use of 9.0 as the threshold rating for countable decay, Viance does suggest in its own calculation that any post rated 9.5 or lower should count as decayed. However, Viance cites no dispositive evidence in this record to support its apparent conclusion that any rating below a perfect 10 denotes decay indicative of serious safety concerns. To the extent that Viance challenges the district court's use of 9.0 as the threshold rating, the district court was not clearly erroneous. In Timber Product's release clarifying its role in the Reports, it noted that the decay ratings in the Reports were based on a subjective determination and that others might have

assigned slightly different ratings. And Chris Barber testified that although a rating of 10 denoted sound wood, he would not classify anything with less than a 10 as "less than sound." The district court could have reasonably concluded there was not a clear line of demarcation between posts rated 9.5 and posts rated 10. In light of the evidence in this record, the district court did not clearly err in choosing a rating of 9.0 as the threshold level of countable decay for its calculations.

Given that threshold rating, the next component of the district court's basis is the number of posts inspected that had a rating of 9.0 or lower. The district court counted thirteen posts with a 9.0 or lower, but did not explain how it arrived at that number. Our independent review of the record suggests the district court's number may be incorrect. The January 2009 Report shows that eight of the forty-five posts from the Alpharetta site that Timber Products visually inspected rated 9.0 or lower. The November 2008 Report shows that all eleven posts inspected from the Baton Rouge site rated a 9.5 or 9.0, but does not distinguish between the two ratings. Assuming, to the benefit of Viance, that ten of those posts rated a 9.0 and only one rated a 9.5, eighteen of the posts from both the Alpharetta and Baton Rouge sites visually inspected by Timber Products rated a 9.0 or lower.[10]

_____

[10] In light of our generous assumption in favor of Viance that ten of the Baton Rouge posts rated 9.0, the district court's count of thirteen total posts rating 9.0 or lower, rather than our assumption of eighteen, may in fact be more accurate. As our discussion below indicates,

30

The next component is the total sample size of posts. The district court made several factual findings in this regard. It found that Viance spent substantial time and resources in an effort to find MCQ-treated posts showing decay, that Viance searched numerous sites for MCQ-treated posts, and that Viance inspected roughly 530 MCQ-treated posts. In light of those findings, the district court concluded that 530 was the appropriate sample size. Record evidence supports these findings. Viance's initial efforts uncovered no signs of decayed posts. Despite visiting eighteen sites and talking to numerous retailers and builders, the private investigator hired by Viance could find no problems suggesting premature decay in MCQ-treated wood. Viance nevertheless continued its search for signs of decay. Dr. Preston, Viance's Director of Research, testified that Viance sent groups to numerous sites looking for MCQ-treated posts, and multiple documents corroborate that testimony. And Dr. Archer, also of Viance, testified that Viance inspected roughly 800 posts and estimated that two-thirds were treated with MCQ. Viance argues that some of those 530 posts were encased in concrete or otherwise not amenable to further testing and thus should not be counted in the total sample size. Viance, however, produced no evidence indicating what percentage of those posts were in concrete or otherwise inaccessible, nor did it indicate what

---

however, this difference is not significant in any event.

31

percentage of the accessible posts that were not tested by Timber Products showed signs of decay based on Viance's own inspection. Given that Viance spent substantial time and effort to find MCQ-treated posts showing decay, that it only called Timber Products in to inspect posts from the Baton Rouge and Alpharetta sites, and that it failed to produce evidence quantifying decay on the other posts it inspected, the district court could have reasonably concluded that it was appropriate to use all 530 MCQ-treated posts that Viance inspected as the total sample size.[11] That being the case, we calculate the appropriate percentage of decayed posts as eighteen out of 530, or 3.4%.[12]

The final, and key, link in the district court's chain of reasoning on this point is whether the percentage of decayed posts found in the study supports the conclusions drawn in Viance's advertising statements regarding serious safety and

---

[11] Using 530 as the total sample size basically assumes that a negligible percentage of MCQ-treated posts outside of the Baton Rouge and Alpharetta sites would have shown a decay rating of 9.0 or less. Given that this record indicates that Viance was searching diligently for MCQ-treated posts showing decay and that it only called Timber Products in to inspect posts from the Baton Rouge and Alpharetta sites, the district court did not clearly err in making that assumption.

Given Viance's failure to produce evidence characterizing the bulk of those 530 posts, we fail to see what other number the district court might have used. On this record, the district court was certainly not obligated to use the fifty-six posts that Viance specifically identified as showing sufficient signs of decay to warrant further testing as the total sample size for the survey.

[12] As noted above, the district court's finding of 2.45% may well be more accurate, but as will be developed below, the difference is inconsequential.

structural integrity concerns in relation to MCQ-treated posts.  The district court

found the percentage of decayed posts to be 2.45%.  Although this calculation may

be in error, as long as the higher percentage, 3.4%, still satisfies the conclusion

that the percentage of decayed posts does not raise serious safety concerns, then

the district court's ultimate finding that the results of the studies do not support the

conclusions in the advertisements is not clearly erroneous.  Although the district

court did not cite any testimony supporting the conclusion that 2.45% was not

sufficient to support the serious concerns raised in the advertisements, Dr.

Kamden, a professor of wood science and technology at Michigan State

University, testified that in his own survey of MCQ, 2.9% of the posts had

"issues."  Given that number, he concluded that MCQ was a "robust, very good

wood preservative."  In light of that testimony, the district court did not clearly err

in finding that the percentage of samples showing decay in Viance's studies, be it

2.45% or up to 3.4%, was not sufficient to support the safety concerns raised in

the advertisements.

iii. District Court's Reliance on Qualifying Language in the Test

Reports

Lastly, Viance attacks the district court's reliance on qualifying language in

the Timber Products Reports and Dr. Nicholas' report on the field stake tests.  In

33

its Reports, Timber Products noted that the Reports did not provide any basis for any conclusion as to the "grade, treatment, or physical quality" of the posts tested. Likewise, in his field stake test reports, Dr. Nicholas noted that "additional field stake test data will be required to confirm this concern about the performance of MCQ in ground contact applications." The district court found that those limitations lowered the support the reports provided for Viance's broad claims about safety concerns. Viance points out that Todd Greer, Vice-President of Timber Products, testified that he had no problem with Viance drawing conclusions regarding micronized copper based on the Timber Products Reports. It also contends that Dr. Nicholas' qualification did not suggest Viance's conclusions were wrong.

The district court's reliance on the limiting qualifications in the Viance tests was not clearly erroneous. Although neither of the qualifications explicitly state that Viance's conclusions are wrong, they both certainly undermine the breadth of the conclusions that Viance seeks to draw from the studies. Moreover, other statements, such as the statement by Todd Greer in his declaration that "[a] claim or suggestion that properly treated outdoor structures built with micronized copper wood may be unsafe or may prematurely fail in service is not warranted by any of

the findings contained in either of these reports," further undermine the broad conclusions that Viance attempts to attribute to its studies.[13]

In sum, the district court did not clearly err in determining that Viance's statements regarding MCQ were literally false. We interpret its first basis as focusing on whether the particular tests performed supported the broad conclusions regarding structural integrity and safety expressed in the Viance advertisements. Given that interpretation and the record support for the district court's finding in that regard, and in light of the other two strong bases relied on by the district court – i.e., the results of the in-service survey and the limiting qualifications in the several reports – the district court did not clearly err in finding that the tests cited do not support the conclusions drawn in the advertisements regarding the safety and efficacy of MCQ.

2. Literal Falsity of Statements Regarding Timber Products

In Point 5 of the injunction, the district court enjoined Viance as follows:

5. Defendants <u>may not</u> indicate or imply that any conclusions or opinions stated in their advertisements concerning the effectiveness of micronized copper preservatives or the safety of structures built with micronized copper-treated wood are verified or endorsed by Timber Products.

---

[13]     In addition, Osmose adduced considerable evidence of other tests suggesting that MCQ-treated wood performed as well as ACQ.

The district court found that statements in the advertisements referencing Timber Products asserted that Timber Products shared Viance's concerns about MCQ. The district court specifically referenced the statement: "The decay, verified by Timber Products Inspection (TP), is considered unacceptable for providing long-term structural integrity for residential and commercial uses." Viance contends that statement is literally true. Viance assigns the following meaning to that sentence: Timber Products verified the decay found in the posts, and in Viance's opinion, the decay supports concerns with long-term structural integrity. It then argues that the assertion that Timber Products verified the decay found in the posts is literally true; thus, the statement is at most misleading. The line between literally false and misleading is not always a clear one, "but it is a fine line, and we will only reverse the district court if its findings are clearly erroneous." Axiom Worldwide, 522 F.3d at 1225.

We do not believe the district court clearly erred. The advertisements relied heavily and repeatedly on Timber Products and its independence and reputation. Significantly, several assertions in the advertisements unambiguously stated that Timber Product's findings raised serious concerns about structural integrity and safety. Bearing in mind that the decay findings, Timber Products, and safety and structural integrity concerns regarding MCQ are repeatedly linked in context, we

36

cannot conclude that the district court clearly erred in determining that Viance's advertisements unambiguously asserted that Timber Products verified or endorsed Viance's conclusions regarding the safety of MCQ.

Also the district court did not clearly err in finding that any statement that indicated that Timber Products verified or endorsed any conclusions or opinions regarding the efficacy of MCQ or the safety of structures built with MCQ-treated wood is literally false. Both Timber Products Reports state that "[t]his inspection report should not be considered as acceptance or rejection for the grade, treatment, or physical quality of the above-referenced material." The Reports simply catalog Timber Products' visual inspection rating of the posts tested. The Reports do not draw any conclusion as to what those ratings indicate about the performance or safety of MCQ. Moreover, Todd Greer stated in his declaration that the "reports do not provide the basis for a conclusion that wood treated with a micronized copper preservative or using a micronized copper wood treating system is unsafe or will fail prematurely in service." He also stated that "[b]ased on the scientific data to which Timber Products Inspection, Inc. has access, including its own inspections, [it] cannot conclude and has not concluded that micronized copper treated wood treating systems, including MCQ, are not as effective and reliable as any other major wood preservative treating system." Finally, he noted that had

37

Timber Products been aware of Viance's intended use of reports in Viance's press releases, Timber Products would not have performed the services referenced therein. In light of the evidence, we are not left with the definite and firm conviction that the district court clearly erred in concluding that Viance's statements asserting that Timber Products endorsed or verified its safety concerns were literally false.

3. The Remaining Elements Regarding a Substantial Likelihood of Success

As noted above, a movant must establish the following elements in order to establish the requisite likelihood of success on a false advertising claim: "(1) the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) the movant has been-or is likely to be-injured as a result of the false advertising." Axiom Worldwide, 522 F.3d at 1224 (internal quotation marks omitted). Having dealt with literal falsity, we turn to Viance's challenges to the second, third and fifth elements.[14]

---

[14] Viance does not challenge the fourth element – that the product or service affects interstate commerce.

## a. Consumer Deception

The classification of an advertisement as literally false or true but misleading affects the movant's burden with respect to the element of consumer deception. If the court deems an advertisement to be literally false, then the movant is not required to present evidence of consumer deception. 1-800 Contacts, 299 F.3d at 1247. If, on the other hand, the court deems the advertisement to be true but misleading, then the movant is required to present evidence of deception. Id. Because the district court did not clearly err in determining the statements at issue were literally false, it correctly found that evidence of consumer deception was not required.

## b. Materiality of the Deception

Even if an advertisement is literally false, the plaintiff must still establish materiality. Id. at 1250. In order to establish materiality, the plaintiff must demonstrate that "the defendant's deception is likely to influence the purchasing decision." Id. (internal quotation marks omitted). A plaintiff may demonstrate this by showing that "the defendants misrepresented an inherent quality or characteristic of the product." Id. (internal quotation marks omitted).

The district court found that the materiality of Viance's false statements was "self-evident" because the advertisements attacked an inherent quality of MCQ,

namely its ability to prevent decay and preserve the structural integrity of wood. Viance challenges the element of materiality only in relation to the statements concerning Timber Products. It claims first that the district court made no finding in this regard and second that the statements concerning Timber Products were not material.

The district court's general finding of materiality appears to focus on whether statements expressing serious concerns regarding the safety and efficacy of MCQ were material. Viance has not challenged that finding insofar as it focuses on the statements regarding the safety and efficacy of MCQ. The materiality of statements regarding Timber Products is equally self-evident, however, in that the statements regarding Timber Products are actionable because those statements indicate that Timber Products verified and endorsed Viance's concerns regarding the safety and efficacy of MCQ. Because the actionable statements regarding Timber Products are intimately tied with Viance's concerns regarding the safety and efficacy of MCQ, those statements are material in that they misrepresent the same inherent quality or characteristic of MCQ, namely its ability to prevent decay and preserve structural integrity. Moreover, the heavy reliance on Timber Product's independence and reputation enhances the likelihood that misrepresentation would influence purchasing decisions. Thus, the district

40

court did not clearly err in determining that the statements regarding MCQ were material.

c. Injury

Viance also contends that the district court failed to make the required finding of an injury or likelihood of injury with regards to the Timber Products statements and that such a finding is not supported by the record. The district court discussed the likelihood of injury from the statements in its analysis of irreparable injury as a factor in favor of a preliminary injunction. For the reasons stated below in section III.B.1, the district court did not clearly err in finding a likelihood of injury from the statements. And for the reasons stated above in section III.A.3.b., the injury flowing from statements regarding Timber Products is inherent in the injury resulting from statements regarding the safety and efficacy of MCQ because the statement that Timber Products verified and endorsed those concerns is intimately tied to those safety concerns. Thus, the district court did not clearly err in finding the statements regarding Timber Products injurious.

In light of the foregoing, we conclude that the district court did not clearly err in finding that Osmose demonstrated a likelihood of success on the merits in its Lanham Act claim.

B. The Remaining Preliminary Injunction Requirements

The district court found that the remaining preliminary injunction factors all weighed in favor of issuing injunctive relief. Viance argues that the district court abused its discretion in finding that there was a substantial threat of irreparable injury to Osmose, that the balance of harms favored enjoining Viance, and that granting the injunction would not disserve the public interest. Specifically, Viance argues that the district court abused its discretion by essentially presuming irreparable harm and that its statements were not likely to cause irreparable harm to Osmose. It next argues that its advertisements caused no harm to Osmose, while the injunction seriously hampers its own ability to debate the subject, shifting market perception. Finally, it argues that the injunction harms the public's interest in the free flow of scientific and commercial information.

1. Irreparable Harm

We note at the outset that the district court found there was a likelihood of irreparable harm to Osmose without applying any presumption on the issue. The district court discussed the presumption of irreparable harm that had been accorded in false advertising cases where the defendant's advertisements were (1) literally false and (2) comparative, but expressed some doubt as to whether such a presumption was still appropriate in light of eBay Inc. v. MercExchange, LLC,

42

547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006), and <u>Axiom Worldwide</u>, 522 F.3d at 1226-28. The district court concluded that no presumption was necessary because the advertisements, on their face, would likely cause irreparable harm. It reasoned that the advertisements contained serious indictments of the safety of MCQ-treated products that would likely be remembered by consumers. It also noted that the stated goal of Viance's campaign was to put Osmose out of business, which would obviously harm Osmose. Because the district court did not rely on a presumption of irreparable injury, we need not decide whether such a presumption still applies in the wake of <u>eBay</u>. Even in the absence of a presumption, the district court's conclusion as to the likelihood of irreparable harm was not an abuse of discretion. The inference that the serious nature of the claims in the advertisements would irreparably harm Osmose's goodwill and market position is certainly reasonable. Viance argues that such harm was unlikely because the intended audience of the advertisements were industry professionals. First, given that one release was titled "Hidden Danger in Your Backyard," it appears that the target audience for the advertisements was not solely industry professionals. Second, to the extent that the advertisements were

directed at companies that supply lumber to consumers, the concerns voiced in the advertisements could reasonably affect their purchasing decisions as well.[15]

2. Balance of Harms

The district court found that the balance of harms weighed in favor of granting the injunction because the ads could seriously damage Osmose's goodwill among consumers and the treated wood industry while Viance would not be seriously harmed because it could still publish its test results. The district court's finding in this regard was not an abuse of discretion. The harm on Osmose's side flows naturally from the likelihood of irreparable injury. And given the scope of the injunction, any arguable harm to Viance is limited. Point 1 of the injunction specifically allows Viance to publish the results of its testing. Viance is also permitted to publish conclusions that are stated in the studies or readily apparent from the data contained in the studies. Thus, Viance's concern that it is hindered in engaging in the scientific debate regarding the efficacy of MCQ is overstated. Although Viance argues that the effect of the injunction will be to shift market perception against Viance, that hardly seems likely. Stopping

---

[15]     We also disagree with Viance's argument that the letter and press release from pressure treated wood producers calling for Viance to drop its campaign demonstrates that the target audience was not confused or influenced by these ads. The fact that certain industry members saw through these ads does not indicate that the purchasing decisions of sellers of pressure treated lumber or ultimate purchasers of pressure treated lumber would not be negatively influenced by these ads.

these advertisements does not disparage Viance's product or inappropriately bolster Osmose's product. The effect of the injunction is only to prohibit Viance from advertising generalizations regarding Osmose's product that the district court has determined are unsupported by Viance's current studies.

### 3. Public Interest

The district court found that the public was served by preventing Viance from disseminating broad conclusions regarding the safety of MCQ-treated wood that exceeded the findings of its studies because the public interest is served by preventing customer confusion or deception. Again, the district court did not abuse its discretion in drawing that conclusion. Viance argues that the public is served by the free flow of commercial and non-commercial speech on topics of consumer safety. But the free flow of scientific information regarding any concern of consumer safety is not hindered here because Viance may still publish tests results and conclusions that are readily apparent from those results. Thus, the injunction, as crafted, only prevents unsupported statements. Such an injunction does not disserve the public interest.

### C. Injunction Against Commenting on Osmose's EPP Certification

Viance argues that the district court abused its discretion by enjoining it regarding Osmose's environmental advertisements because it neither identified nor analyzed any statements by Viance to that effect. We agree.

In pertinent part, the district court enjoined Viance as follows:

6. Defendants may not claim or imply that Osmose's MicroPro process was not certified as EPP by SCS, or that SCS did not consider life cycle analysis including efficacy analysis in awarding EPP certification to Osmose's MicroPro process.

The district court did not identify any advertising statement in which Viance claimed that MicroPro was not certified as an Environmentally Preferable Product ("EPP") by Scientific Certification Systems ("SCS") or that SCS did not consider life cycle analysis in awarding EPP certification to the MicroPro process.[16] Liability follows under § 43(a) of the Lanham Act when a party uses a "false or misleading representation of fact." 15 U.S.C. § 1125(a). Without such a misrepresentation, there is no basis for liability. Because the district court has not identified any statement in which Osmose made such claims, it has not identified a proper basis for Point 6 of the injunction.

---

[16]     EPP stands for Environmentally Preferable Product. EPP Guidelines are established by the EPA. Record evidence indicates that MicroPro technology has been certified EPP by SCS. In its Order, the district court noted that Viance did not contend that the statement that MicroPro technology was certified EPP by SCS was literally false.

46

The district court did discuss EPP certification in the portion of its Order dealing with Viance's motion for a preliminary injunction against Osmose. Viance requested a preliminary injunction against certain advertising statements by Osmose regarding MicroPro's EPP certification, claiming that the statements falsely implied that MicroPro technology was certified by the EPA. The district court denied Viance's request, finding that it had failed to demonstrate that the statements were literally false or misleading or that the statements "had the capacity to deceive consumers into believing MCQ was EPA certified."[17] The district court never linked this finding of fact to its decision to enjoin Viance from claiming MicroPro was not certified as EPP by SCS or that SCS did not consider life cycle analysis, including efficacy analysis, in awarding EPP certification to the MicroPro process. Even if the district court had linked that finding of fact to Point 6 of the injunction, Viance's failure to establish that Osmose's advertising statements falsely implied that MicroPro technology was certified by the EPA is not a proper basis for Point 6 of the injunction because, as we noted above, the district court did not find any statement in which Viance claimed that MicroPro technology was not certified EPP by SCS or that SCS did not consider life cycle

---

[17] Because Viance has not appealed the denial of its request for a preliminary injunction, the correctness of this conclusion is not before us. We express no opinion on the matter.

analysis, including efficacy analysis, in awarding EPP certification to MicroPro technology.

Because the district court did not identify any statement in Viance's advertisements that supports Point 6 of the injunction, the district court abused its discretion in entering that provision.[18]  Accordingly, we vacate Point 6 of the injunction.

D. First Amendment Concerns

Viance argues that the injunction operates as an unconstitutional prior restraint because by its terms it could apply to protected non-commercial speech. Specifically, it argues that the literal terms of the injunction would prohibit it from engaging in many actions beyond commercial speech, such as petitioning the government, publishing scientific papers, arguing before certification organizations, or even giving testimony in this litigation.  We agree and remand with instructions that the scope of the injunction be limited to statements made in commercial advertising and promotion.

---

[18]     We express no opinion on whether a statement claiming or implying that MicroPro was not certified as EPP by SCS or that SCS did not consider life cycle analysis, including efficacy analysis, in awarding EPP certification to MicroPro technology would be literally false or misleading, deceptive, material, and injurious.  Assuming such a statement is identified, that question would be for the district court in the first instance.

"[I]t is well settled that false commercial speech is not protected by the First Amendment and may be banned entirely." Pennzoil, 987 F.2d at 949. Under the Lanham Act, a court may issue an injunction to prevent the use of a "false or misleading representation of fact" in "commercial advertising or promotion." 15 U.S.C. §§ 1116, 1125(a)(1)(B). In this case, Points 2 through 5 of the injunction prohibit Viance from claiming or implying that its studies support concerns regarding the safety and efficacy of MCQ or that Timber Products verified or endorsed those concerns. Nothing in the language of the injunction explicitly limits its scope to advertising or promotional statements. Osmose argues that given the context of the litigation, the injunction was clearly not targeted toward non-commercial speech protected by the First Amendment. In other words, Osmose disavows any intent to apply the injunction to protected non-commercial speech. Certainly the injunction has not currently been enforced in a way indicating that the district court intended to prohibit Viance from making such claims outside of advertising or promotional statements. Nevertheless, the literal terms of the injunction prohibit Viance from making such claims in any setting. Under these circumstances, such a broad prohibition is not warranted in this case. Injunctive relief should be narrowly tailored. ALPO Petfoods, Inc. v. Ralston Purina Co., 913 F.2d 958, 972 (D.C. Cir. 1990) ("The law requires that courts

49

closely tailor injunctions to the harm that they address."). The harm in this case is damage to the goodwill or market position of Osmose's MCQ product based on advertising statements containing broad claims about the safety and efficacy of MCQ that the district court has determined are not supported by Viance's studies. A narrower injunction will address that concern and avoid any possible First Amendment concerns. Accordingly, we remand Points 2 through 5 of the injunction with instructions that those prohibitions be limited to statements made in commercial advertising or promotion.[19] See id. at 972-73 (remanding for removal of phrase "or other related" from injunction so as to limit it to advertising statements).

## IV. CONCLUSION

The district court did not clearly err in determining that Osmose demonstrated a likelihood of success on its Lanham Act claims against Viance's

---

[19]   Viance also argues that the injunction is overbroad because it is not limited to false or misleading advertisements. We disagree. The district court issued the injunction in this case because it found the claims covered by Points 2 through 5 to be literally false. Thus, the injunction is effectively limited to false statements. See Pennzoil, 987 F.2d at 949 ("The injunction is also not overbroad because it only reaches the specific claims that the district court found to be literally false.").

Our conclusion in this regard is bolstered by the fact that the current injunction against Viance is preliminary and thus temporary. Should the district court deem it proper to enter permanent injunctive relief later in the proceedings, it might well consider whether explicitly limiting the terms of the injunction to false or misleading speech is appropriate. Compare id. (finding such limitation unnecessary in context of permanent injunction), with U-Haul Int'l, Inc. v. Jartran, Inc., 793 F.2d 1034, 1042-43 (9th Cir. 1986) (imposing such a limitation in context of permanent injunction).

statements regarding the safety and efficacy of MCQ and Timber Products' endorsement of those views. The district court also did not clearly err in determining that the remaining preliminary injunction factors weighed in favor of enjoining Viance from making such claims. Thus, the district court did not abuse its discretion by enjoining Viance from making such claims. But First Amendment concerns dictate that the provisions of the injunction dealing with such statements be limited to commercial advertising or promotional statements. The district court, however, abused its discretion by enjoining Viance from making claims regarding whether MicroPro was certified EPP by SCS because it failed to identify a basis for that provision of the injunction. Accordingly, we vacate Point 6 of the injunction and remand Points 2 through 5 with instructions that they be limited to commercial advertising or promotional statements.[20]

AFFIRMED in part; VACATED in part; REMANDED in part with instructions.[21]

---

[20]    Viance has not challenged Point 1 of the injunction; it need not be disturbed.

[21]    Osmose's May 25, 2010 supplemental letter is stricken.