[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-11853
_____

D.C. Docket No. 0:12-cv-60741-RNS

DUTY FREE AMERICAS, INC.,

　　　　　　　　　　　　　　　　　　Plaintiff - Appellant,

versus

THE ESTEE LAUDER COMPANIES, INC.,

　　　　　　　　　　　　　　　　　　Defendant - Appellee.
_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(August 7, 2015)

Before MARCUS and WILSON, Circuit Judges, and THAPAR,[*] District Judge.

MARCUS, Circuit Judge:

　　Duty Free Americas, Inc. ("DFA"), which operates duty free stores in many

international airports nationwide, appeals the district court's dismissal of its

---

[*] Honorable Amul R. Thapar, United States District Judge for the Eastern District of Kentucky, sitting by designation.

multicount suit against The Estée Lauder Companies, Inc. ("Estée Lauder"), the largest manufacturer of beauty products sold in duty free retail outlets in the United States. DFA claims that Estée Lauder's refusal to do business with DFA, and its communication of that fact to airport authorities evaluating whether to offer rental space to DFA, violates several federal and state laws. DFA also says that Estée Lauder places anticompetitive restrictions on duty free operators' display space and ability to select their own inventory; it seeks injunctive relief from these requirements. Finally, DFA claims that its competitors disparaged its business methods and financial projections to airport authorities and seeks to hold Estée Lauder accountable for all of those statements. DFA filed suit in the United States District Court for the Southern District of Florida, asserting three claims in its amended complaint: (1) attempted monopolization, in violation of § 2 of the Sherman Act; (2) contributory false advertising, in violation of § 43(a) of the Lanham Act; and (3) tortious interference with a prospective business relationship, in violation of Florida law. The district court dismissed the lawsuit in its entirety for failure to state a claim.

After thorough review, we affirm. On each claim, DFA failed to allege basic facts sufficient to state a claim to relief that is plausible on its face. Thus, in pleading its antitrust claim, DFA did not adequately allege that Estée Lauder engaged in predatory or anticompetitive conduct. Nor has DFA come close to

2

establishing standing to seek injunctive relief from the requirements that Estée Lauder places on its competitors, inasmuch as DFA no longer does any business with Estée Lauder. As for its false advertising claim, DFA failed to plead sufficient facts from which a court could find that Estée Lauder made false statements, or, for that matter, was responsible for any such statements made by DFA's competitors. Finally, the complaint failed to allege any improper conduct sufficient to constitute tortious interference with a business relationship in violation of Florida law.

## I.

### A.

The essential facts contained in DFA's complaint and its attached exhibits are these. DFA operates many duty free stores in American airports with international terminals. DFA is one of approximately ten major operators of duty free stores in the United States. DFA currently holds leases in thirteen international airports located in eleven cities: New York (JFK and LaGuardia), Washington, D.C. (Dulles and Reagan National), Detroit, Miami, Atlanta, Baltimore, San Antonio, Phoenix, San Diego, Salt Lake City, and Charlotte. It competes with other duty free operators for the limited rental space available in U.S. airports servicing international flights.

Airports generally rent their dedicated duty free space for lease terms of between five and ten years.  An airport seeking to rent to a duty free operator proceeds by initiating competitive bidding.  Typically, the airport issues a request for proposal ("RFP"), and interested duty free operators respond with proposals explaining what products they would carry at the airport and the amount of rent they are willing to pay.  Proposed rent in the duty free market is comprised of both a minimum annual guarantee and a percentage of sales revenue.  Normally, all of the space that an airport allocates for duty free retail space is leased by the same operator.

At duty free stores, customers -- who must be outbound international travelers -- can purchase luxury products at discounted prices.  Beauty products -- which include makeup, skin care products, and fragrances -- are a substantial component of duty free stores' product offerings.  And Estée Lauder is the "largest manufacturer of beauty products sold in duty-free stores in U.S. airports."  DFA notes that in 2010 Estée Lauder's market share of cosmetics, a subgroup consisting of makeup and skin care, sold in duty free stores was approximately 45.71%, while its market share for skin care products exceeded 50%.  DFA further estimates that Estée Lauder's market share has increased in the intervening years.  Newcomers to the duty free beauty products market are apparently rare, due to the "extremely limited shelf space available in airport duty free shops," and DFA alleges that

4

"[t]here has been no change in the composition of the top five beauty product manufacturers in the past five years, other than [Estée Lauder's] continuous increase in market share each year."

DFA purchased Estée Lauder beauty products to sell in its duty free stores until June 2008. During that time, Estée Lauder set two different prices for each product -- a suggested domestic retail price and a lower suggested travel retail price. Retailers that sold Estée Lauder products in traditional outlets, such as department stores, could purchase goods at wholesale prices, which were set by discounting the suggested domestic retail prices of items. By contrast, duty free operators like DFA could purchase at lower travel wholesale rates that were set by discounting the suggested travel retail prices for particular products. For most of DFA's relationship with Estée Lauder, the suggested travel retail price for beauty products offered customers a 10% discount off of the suggested domestic retail price.

Duty free operators that contracted with Estée Lauder had to comply with several inventory and display requirements. In particular, Estée Lauder required operators to carry the full line of products within a particular brand ("full line forcing") and carry the company's less-popular fragrances if they wanted to sell cosmetics ("tying"). Estée Lauder also mandated that operators reserve display space of a certain size and quality for its products and that they keep excess

5

inventory in stock, and routinely threatened to cut off all product supply when duty free operators resisted these conditions. According to the complaint and its attached exhibits, DFA was last subject to Estée Lauder's various contractual requirements several years ago: (1) "display space and inventory demands" in March 2008; (2) "full line forcing" in March 2008; and (3) "tying" fragrances to other products in April 2006.

In January 2007, Estée Lauder announced plans to eliminate the differences between its suggested domestic retail prices and suggested travel retail prices. In other words, it would promulgate only one suggested retail price for each product that would be used in both traditional retail outlets and duty free stores. This planned change, which would both increase the prices DFA paid for Estée Lauder products and eliminate the discount that DFA's customers gained by shopping at duty free stores, was supposed to take effect on April 1, 2008. As a result of the changing price structure, DFA terminated its business dealings with Estée Lauder by June 2008.

DFA adapted to the loss of Estée Lauder's product lines by devoting the display space that it formerly reserved for Estée Lauder products to other beauty brands. But at some undisclosed point, DFA sought to renew its prior relationship with Estée Lauder. The manufacturer refused to have any further dealings with

DFA.  The decision not to resume relations with DFA costs Estée Lauder an estimated $14.5 million each year.

Since 2008, DFA has participated in competitive bidding for duty free retail space at four international airports: Newark Liberty International Airport, Boston Logan International Airport, Orlando International Airport, and Hartsfield-Jackson Atlanta International Airport.  Because DFA's allegations of unlawful conduct stem from Estée Lauder's involvement, directly and indirectly, in these bidding processes, we relay the events that occurred in some detail.

In December 2008, Newark Liberty International Airport issued a request for proposal, seeking a tenant to lease its duty free retail space for a seven-year term. DFA submitted a proposal in response to the RFP, as did three competitors: International Shoppes, Dufry, and EJE Travel Retail.  Each of the other operators sold Estée Lauder products.  During the RFP process, Estée Lauder's President of Travel Retailing Worldwide, Olivier Bottrie, sent a letter to the leasing agent responsible for administering Newark's bidding.  The letter included a list of duty free operators that sold Estée Lauder products.  Bottrie wrote: "We are confident that each of these authorized retailers brings the expected quality of in-store execution and required operational excellence necessary to represent our brands and service your valued passengers."

Newark ultimately rejected DFA's proposal and opted to lease its space to Dufry. Newark also ranked the proposals, indicating that it chose the Dufry proposal because "Dufry had . . . [the] strongest financial position." The airport ranked DFA's proposal second to last among those submitted, stating only "Duty Free Americas does not have the rights to sell Est[é]e Lauder brands."

In May 2011, Boston Logan International Airport issued an RFP, seeking a tenant to lease its duty free retail space for a seven-year term. At the time the RFP was issued, DFA had been the incumbent duty free operator at the Boston airport for the last 16 years. DFA submitted a bid for the lease, as did two competitors, International Shoppes and Dufry. Both of the other operators had ongoing relationships with Estée Lauder. During the bidding process, Estée Lauder informed the contractor administering the RFP that the company did not sell its products to DFA. Boston elected to lease its duty free space to International Shoppes. The contractor explained its reasoning, emphasizing two factors: International Shoppes was authorized to sell Estée Lauder products, and the minimum annual guarantee component of International Shoppes' proposed rent was higher than DFA's.

In August 2011, Orlando International Airport issued an RFP, seeking an operator to develop duty free space. DFA submitted a proposal in partnership with Stellar Partners Inc. -- a local Florida entity that operated the duty free stores at

8

Tampa International Airport. Under the terms of DFA and Stellar's joint proposal, each company would run separately branded stores within the Orlando airport. DFA alleges that its bid "proposed to pay millions of dollars more in rent than any other bidder over the life of the contract." Four bids were also submitted by DFA's competitors: Dufry, Heinemann (in conjunction with a local partner, Travel Retail), World Duty Free, and a partnership of Nuance and DFASS. During the bidding process, Bottrie wrote to the Executive Director of the Greater Orlando Aviation Authority to inform him that Estée Lauder would not do business with DFA or with Stellar. The other four bids were submitted by entities or partnerships that sold Estée Lauder products. The Airport Authority awarded its duty free concessions to the Nuance/DFASS partnership, ranking DFA's proposal second among the submitted bids. DFA appealed the decision, and the Airport Authority conducted a hearing on November 15, 2011.

At the appeal hearing, DFA was asked to explain why its proposal implied that it would sell Estée Lauder products in the Orlando Airport if it were awarded the lease.[1] DFA and Stellar attempted to account for the discrepancy by arguing

---

[1] Specifically, DFA's proposal had listed a "significant number of Estée Lauder brand items" that would be sold in its Orlando stores. Next, the promotional brochure that DFA included with its proposal made multiple references to Estée Lauder. First, the brochure included a section entitled "DFA Name Brands." Both Estée Lauder and Clinique -- one of Estée Lauder's brands -- were included in this list. Second, the brochure included pictures of DFA retail space in which Estée Lauder and Clinique signage and products were visible. Finally, during the interview that the Airport Authority conducted after the proposals were submitted, when DFA representatives

9

that its proposal had not been misleading, because the two operators assumed that the Stellar locations within the airport would carry Estée Lauder products. Stellar explained that, in the past, it sold Estée Lauder products in its Tampa duty free space. However, it had been forced to downsize its physical space and could no longer comply with Estée Lauder's display requirements. Stellar's representative claimed that Estée Lauder had assured Stellar that if the company acquired sufficient physical space to meet Estée Lauder's display requirements, the two companies could resume their relationship. [2]

During the appeal hearing, several competitors for the Orlando International Airport contract criticized DFA's proposal. Travel Retail expressed its view that DFA's financial projections were "unreasonable in light of past performance," and that awarding a contract to DFA would be a "risk." Travel Retail further said, "we strongly believe that Estée Lauder is a product which you have to sell." Travel Retail reiterated this view in a letter after the hearing, in which it cited information "received directly from Estée Lauder" that placed "Estée Lauder's market share

---

were asked to confirm that the company had "a direct merchandise purchasing relationship with all that brands [it was] offering," both representatives responded "yes" to the question.

[2] DFA also alleges that Estée Lauder engaged in similar conduct toward another of its partners, Concourse Concessions. Concourse Concessions partners with DFA to run duty free stores in three airports -- Miami, Dulles, and San Diego -- but partners with another operator in the Los Angeles airport. Estée Lauder has refused to sell products to Concourse Concessions for resale in Miami, Dulles, and San Diego, but supplies the operator with products for its Los Angeles location.

10

[at] first in all categories" of beauty products sold in U.S. airport duty free stores. Travel Retail emphasized, "failure to offer the Estée Lauder product line will negatively impact duty free and duty paid sales revenue for both international and domestic travelers." Similarly, Nuance, the winner of the Orlando contract, criticized DFA's proposal, claiming that the ability to sell Estée Lauder products was a "key component" of operating a successful duty free store and "echo[ing]" Travel Retail's concerns. Specifically, Nuance argued that "DFA['s] sale projections are deemed to be unreasonable and not sustainable in light of the history."

In January 2012, the Orlando Airport Authority affirmed its decision to award the Orlando lease to Nuance/DFASS, stating that it found DFA's "sales projections . . . overstated and not reasonably attainable." Specifically, the Airport Authority concluded that DFA's inability to offer Estée Lauder products would adversely impact sales. Moreover, the data that DFA provided from its other airport locations cast doubt on its predictions for sales in Orlando, and DFA's estimates for future performance far exceeded what the independent consultant that the Airport Authority hired to evaluate the proposals believed was probable.

Finally, in July 2011, Hartsfield-Jackson Atlanta International Airport issued an RFP for a seven-year lease to operate its duty free retail space. DFA submitted a proposal here too, as did three of its competitors: World Duty Free, Dufry, and

Nuance. In November 2011, Atlanta's Chief Procurement Officer, Adam Smith, informed the bidders that the contract would be awarded to DFA. In December, an attorney representing one of the other bidders wrote a letter to Atlanta officials regarding DFA. The letter suggested that DFA had made improper representations about its relationship with Estée Lauder, and it included Bottrie's contact information, a list of Estée Lauder-owned brands, and information about the Orlando Airport Authority appeal hearing. The attorney urged Smith to examine DFA's proposal for indications that the company was planning to sell Estée Lauder products if awarded the Atlanta contract, and suggested that Smith contact Bottrie to verify any representations DFA may have made.

Smith contacted DFA. He recounted that DFA had listed 19 stock keeping units of Estée Lauder's products, and asked DFA to confirm that it could in fact carry those items. DFA explained that it could supply everything listed in the proposal out of outstanding inventory. Subsequently, in early January 2012, the contract was officially awarded to DFA.

On January 13, 2012, an attorney representing World Duty Free wrote to Bottrie, asking him whether DFA was authorized to sell Estée Lauder's products. Bottrie responded, "Estée Lauder . . . do[es] not have a commercial relationship with DFA or its affiliates and ha[s] no plans to enter into such a relationship. In

12

accordance, DFA does not have authority to offer our product lines in their operations."[3]

On January 17, Nuance sent a letter to Smith formally protesting the decision to award the Atlanta contract to DFA and accusing DFA of making misrepresentations in its proposal. Nuance stated in its letter "DFA may have made misrepresentations about its ability to carry Estée Lauder brands." The letter also claimed that "a lack of access to Estée Lauder brands would cast doubt on the validity of DFA's projected revenue streams." Nuance based this statement on the fact that "Estée Lauder brands account for 20% of cosmetic and fragrance sales . . . and cosmetic and fragrance sales constitute one of the largest sources of revenue for duty free stores." The letter also contained excerpts from the Orlando appeal decision. The protest letter apparently had no impact on the Atlanta officials' decision.

## B.

On April 26, 2012, DFA commenced this action in the United States District Court for the Southern District of Florida, asserting four claims against Estée Lauder: (1) conspiracy in restraint of trade, in violation of § 1 of the Sherman Act, 15 U.S. § 1; (2) conspiracy to monopolize, in violation of § 2 of the Sherman Act,

---

[3] An attorney representing Nuance later contacted Bottrie, seeking confirmation that Estée Lauder had not resumed relations with DFA. Bottrie responded with a similar letter to the one he sent to World Duty Free, stating that DFA had no relationship with Estée Lauder.

15 U.S. § 2; (3) attempt to monopolize, in violation of § 2 of the Sherman Act; and (4) tortious interference with prospective business relationships, in violation of Florida law.  Estée Lauder moved to dismiss under Federal Rule of Civil Procedure 12(b)(6); the district court granted the motion, and dismissed the claims without prejudice.  Soon thereafter, DFA amended its complaint.  This time, DFA raised three claims: (1) attempt to monopolize, in violation of § 2 of the Sherman Act; (2) contributory false advertising, in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and (3) tortious interference with prospective business relationships, in violation of Florida law.

Estée Lauder again moved to dismiss the claims, and once again, the district court granted Estée Lauder's motion.  This time, though the court dismissed the Lanham Act claim without prejudice, it dismissed the Sherman Act and tortious interference claims with prejudice, because "DFA [had] already had an opportunity to amend these claims" after accessing "tens of thousands" of Estée Lauder documents in discovery.  The court first addressed DFA's attempted monopolization claim, examining the three different forms of conduct that DFA alleged were anticompetitive.  It concluded that the first two -- refusing to deal with DFA and disparaging DFA to airport authorities -- did not constitute anticompetitive conduct within the meaning of the antitrust laws.  As for the last allegation -- that Estée Lauder imposed restrictions on duty free operators' display

14

space allocation and inventory stocking -- the court concluded that the claim was time barred to the extent DFA sought damages. To the extent that DFA sought injunctive relief, the district court held that the claim was barred by laches or, in the alternative, that DFA lacked antitrust standing to pursue it. Next, the court concluded that the Lanham Act claim failed because DFA did not adequately allege that Estée Lauder or any of the duty free operators had made any false or misleading statements about DFA. In the trial court's view, each of the offending statements expressed merely an opinion or prediction for the future and not a verifiable fact. Thus, it concluded that the statements were not actionable under § 43(a) of the Lanham Act. Finally, the court dismissed the tortious interference claim because the complaint contained no allegations of improper conduct that would amount to an unjustified interference with DFA's business relationships.

DFA timely appealed.

## II.

We review <u>de novo</u> the district court's order dismissing DFA's complaint pursuant to Rule 12(b)(6). <u>Henderson v. Wash. Nat. Ins. Co.</u>, 454 F.3d 1278, 1281 (11th Cir. 2006). We accept the allegations in the complaint as true and construe them in the light most favorable to the plaintiff. <u>Murphy v. F.D.I.C.</u>, 208 F.3d 959, 962 (11th Cir. 2000). "However, we afford no presumption of truth to legal conclusions and recitations of the basic elements of a cause of action." <u>Franklin v.</u>

15

Curry, 738 F.3d 1246, 1248 n.1 (11th Cir. 2013) (per curiam). We are "free to affirm the district court's decision on any ground that is supported by the record." United States v. Elmes, 532 F.3d 1138, 1142 (11th Cir. 2008) (quotation omitted); see also Am. United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1059 (11th Cir. 2007) ("[W]e may . . . affirm a district court's decision to grant or deny a motion for any reason, regardless of whether it was raised below.").

Rule 8(a) provides that a plaintiff's pleading "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court has further instructed that the plaintiff must submit "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This "plausibility standard is met only where the facts alleged enable 'the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Simpson v. Sanderson Farms, Inc., 744 F.3d 702, 708 (11th Cir. 2014) (quoting Iqbal, 556 U.S. at 678). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557). Although "[a] plaintiff need not plead

16

'detailed factual allegations[,] . . . a formulaic recitation of the elements of a cause of action will not do,'" and the plaintiff must offer in support of its claim "sufficient factual matter, accepted as true, to 'raise a right to relief above the speculative level.'" Simpson, 744 F.3d at 708 (quoting Twombly, 550 U.S. at 555).

We measure each claim against this standard.

III.

DFA first says that Estée Lauder violated the Sherman Act by attempting to monopolize the market for duty free beauty products sold in United States airports. Section 2 of the Act establishes that "[e]very person who shall . . . attempt to monopolize . . . any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." 15 U.S.C. § 2. Section 15 of the same statute prescribes that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor." 15 U.S.C. § 15. A plaintiff alleging a claim for attempted monopolization under § 2 must plausibly assert three things: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993).

"[T]he conduct requirement is arguably the single most important aspect of attempted monopolization." Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc., 376 F.3d 1065, 1075 (11th Cir. 2004) (quotation omitted). To survive a motion to dismiss, the plaintiff must adequately allege "actual or potential harm to competition." Jacobs v. Tempur-Pedic Int'l, Inc., 626 F.3d 1327, 1339 (11th Cir. 2010). This means the plaintiff must allege a "factual connection between the alleged harmful conduct and its impact [or likely impact] on competition in the market." Id. Damage to individual competitors is rarely sufficient to establish this element. See Spanish Broad. Sys. of Fla., Inc., 376 F.3d at 1072-73 ("Although damage to a critical competitor may also damage competition in general, [the plaintiff] bears the burden of drawing that implication with specific factual allegations." (emphasis omitted)).

"Actual anticompetitive effects include, but are not limited to, reduction of output, increase in price, or deterioration in quality." Jacobs, 626 F.3d at 1339. "[A] showing of market power is necessary, but not sufficient, to establish potential harm to competition." Id. at 1340; see Spanish Broad. Sys. of Fla., Inc., 376 F.3d at 1073 ("A plaintiff seeking to use market power as a proxy for adverse effect must show market power, plus some other ground for believing that the challenged behavior could harm competition in the market . . . ." (quoting Tops Mkts, Inc. v. Quality Mkts, Inc., 142 F.3d 90, 97 (2d Cir. 1998))). To show that

18

the defendant's conduct caused harm to competition, "the plaintiff must define the relevant market and establish that the defendants possessed power in that market." Maris Distrib. Co. v. Anheuser-Busch, Inc., 302 F.3d 1207, 1213 (11th Cir. 2002) (quotation omitted).

The relevant market has two components, and the plaintiff must define both the geographic market and the product market in which the defendant allegedly possesses increasing power. McWane, Inc. v. F.T.C., 783 F.3d 814, 828 (11th Cir. 2015). The relevant geographic market is "the area of effective competition in which a product or its reasonably interchangeable substitutes are traded." L.A. Draper & Son v. Wheelabrator-Frye, Inc., 735 F.2d 414, 423 (11th Cir. 1984) (quotation omitted). The Court considers whether outside sellers are precluded from entering the market, id., and whether consumers cannot realistically turn outside the geographic area, T. Harris Young & Associates, Inc. v. Marquette Electronics, Inc., 931 F.2d 816, 823 (11th Cir. 1991). "[E]conomic and physical barriers to expansion [such] as transportation costs, delivery limitations and customer convenience and preference" are relevant to this determination. L.A. Draper & Son, 735 F.2d at 423 (quotation omitted).

"Defining a relevant product market is primarily a process of describing those groups of producers which, because of the similarity of their products, have the ability -- actual or potential -- to take significant amounts of business away

19

from each other." Polypore Int'l, Inc. v. F.T.C., 686 F.3d 1208, 1217 (11th Cir. 2012) (quoting U.S. Anchor, 7 F.3d at 995). For this reason, we "pay particular attention to evidence of the cross-elasticity of demand" -- the extent to which consumers demand less of the particular product as the price for its alleged substitute declines. Jacobs, 626 F.3d at 1337 & n.16. "A high cross-elasticity of demand (that is, consumers demanding proportionately greater quantities of Product X in response to a relatively minor price increase in Product Y) indicates that the two products are close substitutes for each other," and are part of the same product market. Id. at 1337 n.16. In other words, "[a] product market consists of 'products that have reasonable interchangeability for the purposes for which they are produced.'" McWane, Inc., 783 F.3d at 828 (quoting United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 404 (1956)).

Defining the relevant product market is a fact-intensive endeavor. U.S. Anchor, 7 F.3d at 994. We consider a variety of factors in the calculus, including "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Polypore Int'l, Inc., 686 F.3d at 1217 (quoting U.S. Anchor, 7 F.3d at 995).

Second, the plaintiff must allege that the defendant acted with specific intent to monopolize. Anticompetitive intent is the design "to gain greater market share,

20

to drive up prices, or to obtain some other illegal goal." Mr. Furniture Warehouse, Inc. v. Barclays Am./Commercial Inc., 919 F.2d 1517, 1522 (11th Cir. 1990). We have also explained that intent "may sometimes be inferred from predatory conduct itself." U.S. Anchor, 7 F.3d at 1001.

Lastly, to adequately plead dangerous probability of achieving monopoly power, the plaintiff must allege that the defendant is "close to achieving monopoly power" in the relevant product market. U.S. Anchor, 7 F.3d at 994. "Monopoly power is 'the power to raise prices to supra-competitive levels or . . . the power to exclude competition in the relevant market either by restricting entry of new competitors or by driving existing competitors out of the market.'" Id. (alteration in original) (quoting Am. Key Corp. v. Cole Nat'l Corp., 762 F.2d 1569, 1581 (11th Cir. 1985)); see McWane, Inc., 783 F.3d at 830 ("Monopoly power is the ability to control prices or exclude competition." (quotation omitted)). "[A] dangerous probability of achieving monopoly power may be established by a 50% share" of the relevant market. U.S. Anchor, 7 F.3d at 1000.

We accept for the purposes of our analysis that DFA has adequately defined a relevant product and geographic market. We read the complaint to essentially say that the relevant product market is the retail market for duty free "beauty products," and the relevant geographic market is comprised of airport duty free stores throughout the United States. While Estée Lauder challenges both the

21

definition of the product market and the definition of the geographic market, we have no occasion to address this fact-intensive question at this stage because the complaint wholly fails to allege any truly anticompetitive conduct on Estée Lauder's part -- no matter how broadly or narrowly the market is defined.[4] Because our analysis begins and ends with the first, and most important, element of an attempted monopolization claim, we also decline to reach Estée Lauder's arguments about anticompetitive intent and probability of achieving monopoly power. We find that each of DFA's allegations of anticompetitive conduct is insufficient to state a claim, and accordingly affirm the district court's dismissal of the antitrust claims. Moreover, we conclude that DFA lacks both constitutional and antitrust standing to complain about the requirements that Estée Lauder places on DFA's competitors, because DFA has not alleged that those restrictions have caused it any injury.

A.

DFA first argues that Estée Lauder's refusal to reinstate its sales relationship with DFA constitutes anticompetitive conduct. It is by now well settled that "[a] unilateral refusal to deal is [generally] not unlawful." Mr. Furniture Warehouse,

---

[4] DFA is not completely clear in its complaint whether it is defining the relevant market as the market to sell or to manufacture beauty products to be sold in airport duty free stores. On the one hand, the complaint alleges that DFA licenses brand names and manufactures their products, and, on the other hand, the complaint posits that Estée Lauder has entered the sales side of the market by hiring its own staff to work in duty free stores and by placing vending machines in DFA-dedicated airports. Estée Lauder challenges both formulations, arguing that it is not a seller -- or at least not an airport duty free retailer -- and DFA is not a manufacturer.

Inc., 919 F.2d at 1522 (second alteration in original).  The Supreme Court has for many years emphasized that "the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"  Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP (Trinko), 540 U.S. 398, 408 (2004) (alteration in original) (quoting United States v. Colgate & Co., 250 U.S. 300, 307 (1919)).  Moreover, the Court has "been very cautious in recognizing . . . exceptions" to that rule "because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm."  Id.

At the same time, "[t]he high value that [courts] have placed on the right to refuse to deal with other firms does not mean that the right is unqualified."  Aspen Skiing Co. v. Aspen Highlands Skiing Corp. (Aspen Skiing), 472 U.S. 585, 601 (1985).  Thus, a refusal to deal under some circumstances "can constitute anticompetitive conduct and violate § 2."  Trinko, 540 U.S. at 408.  We come, then, to the first basic question: whether DFA's refusal to deal allegations "fit within existing exceptions or provide a basis, under traditional antitrust principles, for recognizing a new one."  Id.  We conclude that they do not.

DFA claims that its complaint sets forth sufficient facts yielding an inference of an anticompetitive refusal to deal within the meaning of two Supreme Court

23

cases: Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, and Otter Tail Power Co. v. United States (Otter Tail), 410 U.S. 366 (1973). But as we see it, these two cases are persuasively distinguishable, and this case provides no compelling reason to depart from a business entity's general "right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761 (1984).

First, in Aspen Skiing, a system was developed in Aspen, Colorado at a time when each of its three major ski resorts were independently owned, under which skiers could purchase an "all-Aspen" pass that would allow them to use specially-purchased tickets interchangeably at all the resorts. 472 U.S. at 587-89. One company, Ski Co., subsequently gained control of three of the four major resorts, but the fourth, Highlands, remained independent. Id. at 589-90. Ski Co. then unilaterally discontinued the "all-Aspen" pass, and subsequently refused to enter into any cooperative arrangement allowing Highlands customers access to any of its resorts. Id. at 592-94. It also refused to sell lift tickets to Highland, even when Highland offered to pay the market retail price of the tickets. Id. at 593.

The Court held that Ski Co. had engaged in anticompetitive conduct by terminating the all-Aspen program, emphasizing that Ski Co. had not "merely reject[ed] a novel offer to participate in a cooperative venture that had been proposed by a competitor. Rather, [Ski Co.] elected to make an important change

24

in a pattern of distribution that had originated in a competitive market and had persisted for several years." Id. at 603. The Supreme Court acknowledged that this conduct was "not necessarily anticompetitive." Id. at 604. But it raised enough of a question that the Court was required to consider the effect of Ski Co.'s actions on Highlands, the "impact on consumers[,] and whether [the company] ha[d] impaired competition in an unnecessarily restrictive way," id. at 605. The Court noted that customers strongly preferred the all-Aspen pass, id. at 606-07, and that Highlands's market share dropped from approximately 20% to 11% over the four year period after the pass was discontinued, id. at 594-95, 607-08. Under these circumstances, the Court explained,"[t]he jury may well have concluded that Ski Co. elected to forgo . . . short-run benefits because it was more interested in reducing competition in the Aspen market over the long run by harming its smaller competitor." Id. at 608.

The Supreme Court's later opinion in Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, provides further guidance. Trinko clarified that Aspen Skiing embodies only a "limited exception" to the general rule that firms may choose the other companies with which they deal. Id. at 409. In Trinko, the plaintiffs alleged that defendant Verizon was statutorily obliged to make its operations support system available to its competitors, but that Verizon essentially refused to deal with those competitors by ignoring or delaying its

25

response to their requests for access. Id. at 402-05; see Covad Commc'ns Co. v. BellSouth Corp. (Covad II), 374 F.3d 1044, 1047-48 (11th Cir. 2004). The Supreme Court held that the plaintiffs had not stated a refusal to deal claim under Aspen Skiing, characterizing that case as "at or near the outer boundary of § 2 liability." Trinko, 540 U.S. at 409. The Court held that the Trinko plaintiffs could not state a refusal to deal claim under Aspen Skiing for two primary reasons. As an initial matter, the plaintiff in Aspen Skiing had demonstrated "[t]he unilateral termination of a voluntary (and thus presumably profitable) course of dealing," which "suggested a willingness to forsake short-term profits to achieve an anticompetitive end." Id. (emphasis in original). By contrast, the Trinko plaintiffs did "not allege that Verizon voluntarily engaged in a course of dealing with its rivals." Id. Interpreting this portion of the opinion, we have explained, "Trinko now effectively makes the unilateral termination of a voluntary course of dealing a requirement for a valid refusal-to-deal claim under Aspen." Covad II, 374 F.3d at 1049.

The Supreme Court also emphasized "pricing behavior," noting that the plaintiff in Aspen Skiing was willing to compensate the defendant at the price its rival charged its ordinary customers. Trinko, 540 U.S. at 409. By contrast, the Trinko plaintiffs complained about Verizon's reluctance to deal at a statutorily set "cost-based rate of compensation." Id. ("Verizon's reluctance to interconnect at

26

the cost-based rate of compensation . . . tells us nothing about dreams of monopoly.").

In our view, DFA has similarly failed to state a refusal to deal claim under Aspen Skiing. For starters, DFA has not alleged that Estée Lauder unilaterally terminated the business relationship between the two companies. Rather, the district court found, and we agree, that DFA ceased dealing with Estée Lauder of its own accord. DFA argues that this Court must credit the complaint's allegation that Estée Lauder is responsible for ending the relationship between the two parties. However, the complaint did not allege that Estée Lauder originally terminated the relationship in 2008. Rather, the complaint used broad language to generally allege that Estée Lauder refused to do business with DFA. It says, for example, "[Estée Lauder] refused to sell its products to DFA," and that Estée Lauder attempted "to isolate and exclude DFA," without specifically mentioning how the parties' business relationship was terminated. Indeed, the complaint focuses not on the relationship's end but on the fact that, while "DFA has approached [Estée Lauder] in an effort to resume their . . . relationship several times[,] [Estée Lauder] has refused to even discuss this possibility."

Moreover, when Estée Lauder filed its motion to dismiss, the district court conducted a hearing. At that proceeding, DFA's counsel admitted that DFA terminated the relationship. The district court asked counsel: "Isn't it undisputed

that [DFA] initially terminated its relationship and then they went back and said, 'Now we want to restate [sic] our relationship, and [Estée Lauder] refused to restart it[?]" Counsel responded:

> [A]fter DFA did not want to purchase from [Estée Lauder] because of the price increase, you're right. They went back to them. But I would say there's additional facts that would suggest that the initiative to refuse to deal had moved to [Estée Lauder] certainly by 2010 . . . .

Because DFA's own characterization of its complaint at the hearing was that DFA, not Estée Lauder, terminated the relationship, its attempt to now argue the opposite is unpersuasive.

But even if we were not persuaded by DFA's own description of the termination at the hearing before the district court, DFA referred to the transcript of the Orlando RFP appeal hearing repeatedly in its complaint and attached an excerpt of the transcript as an exhibit. At the Orlando hearing, a representative for DFA noted that all of the duty free operators had disagreed with Estée Lauder's proposed price increases. He went on to explain: "DFA was the only company that followed through on its conviction that the Estée Lauder pricing change was not in keeping with the spirit of customer duty-free savings expectations. And as a consequence, DFA quit offering Estée Lauder products in its stores." As a document which was referenced in the complaint, and is central to the issue of whether DFA adequately alleged anticompetitive conduct, the district court was entitled to consider the transcript and the facts therein. Bickley v. Caremark RX,

28

Inc., 461 F.3d 1325, 1329 n.7 (11th Cir. 2006) ("[W]here the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleading for purposes of Rule 12(b)(6) dismissal." (quotation omitted)); Maxcess, Inc. v. Lucent Technologies, Inc., 433 F.3d 1337, 1340 n.3 (11th Cir. 2005) (per curiam) (stating that a court may consider documents "central to the plaintiff's claims and . . . undisputed in terms of authenticity").

Aspen Skiing is also distinguishable from this case in other significant ways. Thus, while the Aspen Skiing plaintiffs demonstrated their willingness to pay the market price for the defendant's goods, DFA repeatedly asserts in its complaint that it strongly resisted Estée Lauder's across the board price increases. In this regard, DFA far more closely resembles the Trinko plaintiffs, with their insistence that Verizon had to deal with its rivals at cost.

We are likewise unpersuaded by DFA's suggestion that the Supreme Court's decision in Otter Tail applies. Notably, Otter Tail involved "a vertically integrated monopolist that refuse[d] to deal with a customer to foreclose competition in a second market." See Covad Commc'ns Co. v. BellSouth Corp., 299 F.3d 1272, 1289 (11th Cir. 2002), vacated, 540 U.S. 1147 (2005), overruled on other grounds by Covad II, 374 F.3d 1044; see also IIIB Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 772b3, at 205 (3d ed. 2008) ("The defendant [in

29

Otter Tail] possessed a natural monopoly.  This monopoly was partially regulated in ways that may have allowed it to operate to the detriment of consumers through vertical integration.  Third, the case ought to be read in light of strong historical formulations from the common law imposing broad duties to deal on public utilities.").  Here, by contrast, DFA has not alleged that Estée Lauder is a monopolist attempting to leverage its power to foreclose competition in a related or secondary market.  Rather, taken in the light most favorable to DFA, the complaint establishes only that Estée Lauder has captured half of the market for supplying beauty products to duty free operators in U.S. airports.  Thus, even if Estée Lauder is seeking to move into the sales market, it is not a monopolist, much less a vertically integrated monopolist, rendering Otter Tail inapplicable.

B.

DFA also cites as predatory conduct that Estée Lauder made false statements about DFA during airport bidding processes.  Disparagement is rarely a basis for finding attempted monopolization under § 2, because even false statements about a single competitor often do not meet the requisite standard of generating harm to competition.  See Spanish Broad. Sys. of Fla., Inc., 376 F.3d at 1076-77.  As we have explained, when a defendant makes false statements -- even clearly false statements -- about a competitor, "these . . . practices might be characterized as unsavory, or even illegal under other laws," but "they do not give rise to a federal

30

antitrust claim without factual allegations specifically addressing how these practices have harmed competition." Id. Indeed, many of our sister circuits have adopted a presumption that misrepresentations or false statements about a competitor have a de minimis effect on competition. See, e.g., Lenox MacLaren Surgical Corp. v. Medtronic, Inc., 762 F.3d 1114, 1127 (10th Cir. 2014); Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc., 323 F.3d 366, 370 (6th Cir. 2003); Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc. (Harcourt), 108 F.3d 1147, 1152 (9th Cir. 1997); Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs., Div. of/& Am. Home Prods. Corp., 850 F.2d 904, 916 (2d Cir. 1988); see also Mercatus Grp., LLC v. Lake Forest Hosp., 641 F.3d 834, 852 (7th Cir. 2011) ("[C]laims based on one competitor's disparagement of another should presumptively be ignored. . . . [A]bsent an accompanying coercive enforcement mechanism of some kind, even demonstrably false commercial speech is not actionable under the antitrust laws." (quotations omitted and alteration adopted)).

These courts generally require a plaintiff alleging disparagement to rebut the presumption by showing the defendant's statements were "(1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible to neutralization or other offset by rivals." Lenox

MacLaren Surgical Corp., 762 F.3d at 1127; accord Harcourt, 108 F.3d at 1152; Nat'l Ass'n of Pharm. Mfrs., 850 F.2d at 916.

We agree that these factors are at least relevant to determining whether a defendant engaged in anticompetitive disparagement of a competitor. As the Ninth Circuit has explained, "distinguishing false statements on which buyers do, or ought reasonably to, rely from customary puffing is not easy," particularly because most buyers "recognize disparagement as non-objective and highly biased." Harcourt, 108 F.3d at 1152 (quoting III Phillip Areeda & Donald F. Turner, Antitrust Law ¶ 737b, at 278 (1978)). Moreover, where a plaintiff complains of isolated rather than systemic disparagement, the effects on the plaintiff are necessarily speculative and the effects on competition even more so. See id.

To resolve this case, however, we need not decide whether the plaintiff must present facts to support each of these factors, because, at the most basic level, DFA has failed to allege that Estée Lauder made any clearly false statements. As we see it, a plaintiff alleging anticompetitive disparagement must allege, at a minimum, statements that were demonstrably false in order to survive a motion to dismiss. Indeed, DFA seems to agree with this baseline requirement, inasmuch as it urges us to hold that a claim may go forward on allegations of deliberate "submission of false information to a decision-making governmental agency."

32

DFA's complaint identifies three instances of disparagement: (1) Estée Lauder sent a letter to the Newark Airport Authority including a list of its dealers and its belief that they were quality operators; (2) Estée Lauder told Boston and Orlando airport officials that it did not deal with DFA; and (3) Estée Lauder communicated its market share and the fact that it did not deal with DFA to other duty free operators. Even taking these allegations in the light most favorable to DFA, none of the statements are false. First, Estée Lauder's statement vouching for the quality of its duty free partners neither refers to DFA nor expresses an opinion about the quality of its work. Moreover, Estée Lauder does not have a relationship with DFA, and there is no allegation that the market share it communicated to its duty free operator customers was inflated or otherwise incorrect. For these reasons, we are unable to find any allegations of disparagement that could offend the antitrust laws in DFA's complaint.

Moreover, DFA has failed to allege that any of these communications harmed <u>competition</u>. Rather, the complaint contains numerous examples of robust competition between the duty free operators to obtain airport leases. In fact, each of the relevant RFPs resulted in an award to a different operator. DFA itself was awarded the Atlanta duty free concessions contract after successfully rebutting claims that it would be unable to sell any Estée Lauder products. Similarly, during

33

the Orlando RFP, DFA was offered a full and fair opportunity to contest the statements that other duty free operators made against it.

The complaint also does not allege that DFA is being pushed out of the duty free beauty products market. Rather, it concedes that DFA was able to develop demand for new beauty brands, and continues to sell beauty items despite losing access to Estée Lauder products. Finally, and perhaps most compellingly, DFA's strategy of offering a wider array of products than its competitors appears to be working. The complaint alleges that DFA currently operates the duty free commercial spaces in more than half of the airports that possess that space -- it is the leaseholder in 13 of the 25 airports.

As we have explained, "[a]lthough damage to a critical competitor <u>may</u> also damage competition in general, [the plaintiff] bears the burden of drawing that implication with <u>specific factual allegations</u>." <u>Spanish Broad. Sys. of Fla., Inc.,</u> 376 F.3d at 1072-73 (second emphasis added). And "market power alone cannot be sufficient to show the potential for genuine adverse effects on competition"; the plaintiff is "required [to make] specific allegations linking market power to harm to competition in that market." <u>Id.</u> at 1073; <u>see also</u> <u>Tops Mkts, Inc.,</u> 142 F.3d at 97 ("A plaintiff seeking to use market power as a proxy for adverse effect must show market power, plus some other ground for believing that the challenged behavior could harm competition in the market, such as the inherent

34

anticompetitive nature of the defendant's behavior or the structure of the interbrand market."). Here, it is not enough for DFA to allege that Estée Lauder is the top supplier of duty free beauty products. DFA was required to link that fact to a competitive harm.

Finally, DFA argues that the district court "refused to treat as true the allegations in the Complaint attributing statements by [Estée Lauder]-favored operators to [Estée Lauder]." However, DFA did not allege a conspiracy between Estée Lauder and the operators, nor did it claim any agency relationship between the companies. Rather, the complaint, taken in the light most favorable to DFA, simply asserts that "[Estée Lauder] is aware of and has not stopped its favored duty free operators from representing to airport authorities that DFA . . . cannot meet its financial bids to airports." These conclusory statements provide no legal basis for attributing the statements to Estée Lauder.

C.

DFA's final claim is that Estée Lauder's restrictions on its customers' display space and its inventory requirements are anticompetitive. Although DFA's complaint seeks damages -- and the company argued in its briefing before this Court that damages might be appropriate -- DFA's counsel stated at oral argument that it was abandoning any claim for damages resulting from Estée Lauder's display space and inventory requirements. In any event, to the extent DFA seeks

35

damages on this count, its claim is time barred. An action by a private party seeking damages based on a defendant's antitrust violations must be "commenced within four years after the cause of action accrued." 15 U.S.C. § 15(b); see id. § 15. The complaint establishes that DFA was last subject to Estée Lauder's requirements several years ago: (1) "display space and inventory demands" in March 2008; (2) "full line forcing" in March 2008; and (3) "tying" fragrances to other products in April 2006. Because DFA did not bring suit until April 26, 2012, any claim for damages is barred by the statute of limitations.

DFA says that even if it cannot state a claim for damages, it may still seek injunctive relief. See 15 U.S.C. § 26 ("Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . ."). Because DFA is not a customer of Estée Lauder, and thus is not subject to any of these requirements, we are hard pressed to see how it has constitutional standing to challenge them. As the party invoking federal jurisdiction, DFA had the burden of demonstrating that it has standing to sue. Mulhall v. UNITE HERE Local 355, 618 F.3d 1279, 1286 (11th Cir. 2010); see also Church v. City of Huntsville, 30 F.3d 1332, 1336 (11th Cir. 1994) ("[S]tanding requirements 'are not mere pleading requirements but rather are an indispensable part of the plaintiff's case.' Therefore, each element of standing must be supported 'with the manner and

36

degree of evidence required at the successive stages of the litigation.'" (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992))). "[B]ecause the constitutional standing doctrine stems directly from Article III's 'case or controversy' requirement, this issue implicates our subject matter jurisdiction, and accordingly must be addressed as a threshold matter regardless of whether it is raised by the parties." Nat'l Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1242 (11th Cir. 2003). When analyzing a defendant's "motion to dismiss we must evaluate standing based on the facts alleged in the complaint, and we may not 'speculate concerning the existence of standing or piece together support for the plaintiff.'" Shotz v. Cates, 256 F.3d 1077, 1081 (11th Cir. 2001) (quotation omitted)).

The test for Article III standing is by now well settled. "First, the plaintiff must have suffered an 'injury in fact' -- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (quotation omitted). Second, the plaintiff must establish a causal connection between its injury and the defendant's conduct. Id. Third, the plaintiff must show that it is likely -- and not merely speculative -- that a favorable decision by the court will redress the injury. Id. at 561. Moreover, we have explained that there is an additional element to the injury in fact requirement when a plaintiff seeks injunctive relief. Houston v.

37

Marod Supermarkets, Inc., 733 F.3d 1323, 1328 (11th Cir. 2013). "Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate -- as opposed to a merely conjectural or hypothetical -- threat of future injury." Wooden v. Bd. of Regents of Univ. Sys. of Ga., 247 F.3d 1262, 1284 (11th Cir. 2001) (quoting Church, 30 F.3d at 1337); see City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983) ("[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." (second alteration in original) (quotation omitted)).

The fact that DFA may have been injured by the display and inventory requirements in the past -- as late as March 2008 -- cannot be sufficient to establish an injury in fact that would support injunctive relief. The complaint contains no allegation that those restrictions caused any lasting impact or likely future injury, and thus DFA has not met the requirement that it show harm that is "actual or imminent." Lujan, 504 U.S. at 560. Absent facts suggesting that former exposure to Estée Lauder's requirements caused "continuing, present adverse effects" on DFA, Estée Lauder's past conduct cannot be the basis of a request for injunctive relief. Lyons, 461 U.S. at 102; see Church, 30 F.3d at 1337 ("Logically, a prospective remedy will provide no relief for an injury that is, and likely will remain, entirely in the past." (quotation omitted)).

38

DFA claimed at oral argument that it would suffer injury if it resumes purchasing from Estée Lauder and becomes subject to Estée Lauder's requirements. This cannot be characterized as a "concrete" or "actual" injury in fact because, by its very terms, it has not yet occurred, and indeed may never occur.

DFA also suggests that it is injured by the display space and inventory requirements because its competitors are still subject to them. But DFA fails to provide any plausible connection between an injury it has sustained and the restrictions which DFA claims harm its competitors. Indeed, DFA alleges in its complaint that it protested the restrictions when it was subject to them several years ago. Moreover, DFA draws attention to the ways in which the restrictions -- which limit its competitors' ability to offer a wide array of products -- benefit DFA. Specifically, DFA claims to "obtain[] licenses from a number of high-end beauty product brand owners" that its competitors often do not carry because they do not have enough space. DFA also alleges that it is "able to offer more and more prominent display space to non-[Estée Lauder] brands than [other] duty free operators do." In short, nothing in the complaint suggests that DFA is harmed by Estée Lauder's restrictions on other duty free operators. We therefore hold that DFA does not have constitutional standing to challenge the display space and inventory requirements.

Because DFA cannot demonstrate that it has Article III standing to challenge Estée Lauder's contractual requirements, it plainly follows that it cannot establish what our cases have referred to as "antitrust standing." See Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp., 604 F.3d 1291, 1299 (11th Cir. 2010) ("To have antitrust standing, a party must do more than meet the basic 'case or controversy' requirement that would satisfy constitutional standing; instead, the party must show that it satisfies a number of prudential considerations aimed at preserving the effective enforcement of the antitrust laws." (quotation omitted)).

We analyze antitrust standing using a two pronged test that "involves consideration of the nexus between the antitrust violation and the plaintiff's harm and whether the harm alleged is of the type for which Congress provides a remedy." Sunbeam Television Corp. v. Nielsen Media Research, Inc., 711 F.3d 1264, 1271 (11th Cir. 2013). First, we consider whether the plaintiff has suffered an antitrust injury. Id. "Antitrust injury is 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendant['s] acts unlawful.'" Palmyra Park Hosp. Inc., 604 F.3d at 1299 (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)). When a plaintiff is seeking injunctive relief, this means it "must allege threatened injury that would constitute antitrust injury if inflicted upon the plaintiff and the defendant's causal responsibility for such threatened injury." Id. at 1452. Second, the plaintiff must

40

"be an 'efficient enforcer' of the antitrust laws." Sunbeam Television Corp., 711

F.3d at 1271. When only injunctive relief is sought, "the dangers of mismanaging

the antitrust laws are less pervasive," Todorov v. DCH Healthcare Auth., 921 F.2d

1438, 1452 (11th Cir. 1991), and accordingly "we are less concerned about

whether the party would be the most efficient enforcer of the antitrust laws,"

Palmyra Park Hosp. Inc., 604 F.3d at 1299-300. Nevertheless, certain factors that

the Court typically considers when determining whether a plaintiff is an efficient

enforcer remain relevant to this Court's inquiry into whether injunctive relief

would be appropriate. See Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S.

104, 111 n.6 (1986); Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 437 (2d

Cir. 2005).[5] Thus, for example, a plaintiff who has suffered only indirect injury, or

who alleges speculative damages, may lack antitrust standing to seek an injunction.

Again, DFA has not alleged that it suffers any injury as a result of Estée

Lauder's restrictions on its competitors, much less that it suffers an antitrust injury.

And even if DFA had plausibly alleged that it sustained an antitrust injury, we

---

[5] This Court usually considers six factors in determining whether a plaintiff would be an efficient enforcer of the antitrust laws: (1) whether the plaintiff has suffered a direct injury; (2) whether its injury is remote; (3) whether other plaintiffs are better suited to bring the suit; (4) whether the plaintiff's injuries are speculative; (5) whether the calculation of damages would be complex and run the risk of duplicative recoveries; and (6) whether the plaintiff could enforce the court's judgment. Sunbeam Television Corp., 711 F.3d at 1271 (citing Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 538-45 (1983)). When the plaintiff seeks only equitable relief, however, some of these factors -- such as the danger of duplicative recoveries, complexity of assessing damages, and the existence of more suitable plaintiffs -- are not implicated. Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 111 n.6 (1986).

would still be obliged to find that it is not an efficient enforcer of the antitrust laws because it is not currently subject to Estée Lauder's display space and inventory restrictions and has not been for several years. This means that DFA could not enforce any judgment that we would reach about the requirements, and that any injury to DFA would necessarily be speculative -- something that may or may not occur in the future. Plainly, another duty free operator that currently maintains a relationship with Estée Lauder would be in a far better position than DFA to clarify the contours of Estée Lauder's restrictions and to point out what harm, if any, those requirements may cause.[6]

## IV.

DFA's second claim is that its competitors made statements to airport authorities that amount to actionable false advertising under § 43(a) of the Lanham Act. DFA argues that Estée Lauder can be held liable for these statements based

---

[6] The Supreme Court's recent decision in Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377 (2014), casts doubt on the future of prudential standing doctrines such as antitrust standing. In Lexmark, the Supreme Court declined to adopt the antitrust standing test in the Lanham Act context. Id. at 1385-87, 1391. In the course of this discussion, the Court questioned referring to the test as one of prudential "standing" -- noting that, in actuality, it is neither prudential nor an inquiry into standing, but an analysis of whether the plaintiff's "injuries were proximately caused by a defendant's antitrust violations." Id. at 1386-87 n.4. This, the Court explained, is a statutory interpretation question about "the scope of the private remedy created by Congress" when it drafted the antitrust laws. Id. at 1386-87 (quotation omitted). However, Lexmark is a Lanham Act case, and this discussion is dicta. We do not "lightly cast aside" Supreme Court dicta, Schwab v. Crosby, 451 F.3d 1308, 1325 (11th Cir. 2006), but "[u]nder the prior precedent rule, we are bound to follow a prior binding precedent unless and until it is overruled by this court en banc or by the Supreme Court." United States v. Vega-Castillo, 540 F.3d 1235, 1236 (11th Cir. 2008) (quotation omitted). In any event, any impact that Lexmark may have on the notion of antitrust standing is utterly immaterial in this case, because DFA has not established that it has Article III standing.

on a theory of contributory liability. Estée Lauder responds that the claim must necessarily fail both because the Lanham Act's prohibition on false advertising does not include a derivative claim based on contributory liability and because, even if it did, DFA has not alleged facts sufficient to support such a claim. While we agree with DFA that the prohibition on false advertising in § 43(a) of the Lanham Act may allow a claim based on contributory liability, the complaint does not come close to alleging the necessary facts. Thus, we affirm the dismissal of the Lanham Act claim for failure to state a claim.

Whether § 43(a) of the Lanham Act includes within its ambit a claim for false advertising based on contributory liability is a question of first impression. DFA has cited only one case in which a circuit court recognized the possibility that a defendant could be contributorily liable for a third party's false advertising. See Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P., 380 F.3d 126, 132-33 (2d Cir. 2004). Moreover, our research suggests that while district courts routinely assume that contributory liability claims are available, neither the Supreme Court nor any Court of Appeals has explicitly considered and resolved this question. See, e.g., Coach, Inc. v. Sapatis, 994 F. Supp. 2d 192, 201 (D.N.H. 2014); Merck Eprova AG v. Brookstone Pharm., LLC, 920 F. Supp. 2d 404, 425 (S.D.N.Y. 2013); Merck Eprova AG v. Gnosis S.p.A., 901 F. Supp. 2d 436, 456 (S.D.N.Y. 2012), aff'd, 760 F.3d 247 (2d Cir. 2014); Coach, Inc. v. Farmers Mkt.

43

& Auction, 881 F. Supp. 2d 695, 704 (D. Md. 2012); ADT Sec. Servs., Inc. v. Sec. One Int'l, Inc., No. 11-CV-05149 YGR, 2012 WL 4068632, at \*3 (N.D. Cal. Sept. 14, 2012); Campagnolo S.R.L. v. Full Speed Ahead, Inc., No. C08-1372 RSM, 2010 WL 2079694, at \*4 (W.D. Wash. May 20, 2010), aff'd, 447 F. App'x 814 (9th Cir. 2011).

Although we begin any statutory construction by looking to the plain language of the provision at issue, Sebelius v. Cloer, 133 S. Ct. 1886, 1893 (2013), contributory liability under the Lanham Act is a judicially developed doctrine, see Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc., 496 F.3d 1231, 1245 (11th Cir. 2007) (noting that contributory liability actions "stem from the general prohibitory language" of the Act's trademark infringement provisions). Indeed, in the trademark infringement arena, the Supreme Court has long recognized that liability "can extend beyond those who actually mislabel goods." Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 853 (1982). This means that when a claim involves trademark infringement, a manufacturer or distributor can be liable if it "intentionally induces another to infringe a trademark" or "continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement." Id. at 854 (citing William R. Warner & Co. v. Eli Lilly & Co., 265 U.S. 526 (1924)).

Interpreting this language, this Court has found no reason to confine the doctrine to manufacturers, and has expanded it to cover a wide variety of trademark infringement contexts. Mini Maid Servs. Co. v. Maid Brigade Sys., Inc., 967 F.2d 1516, 1522 (11th Cir. 1992) ("With respect to a franchisor's liability for the independent infringing acts of its franchisees, we hold that the franchisor may be held accountable only if it intentionally induced its franchisees to infringe another's trademark or if it knowingly participated in a scheme of trademark infringement carried out by its franchisees."); Bauer Lamp Co. v. Shaffer, 941 F.2d 1165, 1171 (11th Cir. 1991) ("A person who knowingly participates in furthering the trade dress infringement is liable as a contributing party."). Our sister circuits have taken a similar approach. See Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259 (9th Cir. 1996); Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1432 (3d Cir. 1994); Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc., 955 F.2d 1143, 1149 (7th Cir. 1992); see also Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 106-09 (2d Cir. 2010) (assuming, without deciding, that Inwood applied to a claim outside the manufacturing context).

The rationale for allowing contributory trademark infringement actions supports recognizing a similar theory of liability in the false advertising context. For starters, § 43(a) of the Lanham Act contains two different classes of prohibitions: one banning trademark infringement and one prohibiting false

45

advertising.  Each cause of action is a subpart of a single statutory provision, which

reads this way:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

These prohibitions are found in the same statutory provision, and they share

the same introductory clause.  We analyze this structure in light of the core

principle that "[s]tatutory construction is a holistic endeavor," Koons Buick

Pontiac GMC, Inc. v. Nigh, 543 U.S. 50, 60 (2004) (quotation omitted), and that

individual provisions are "often clarified by the remainder of the statutory

scheme," United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,

484 U.S. 365, 371 (1988).  The placement of the two prohibitions in the same

statutory section -- and correspondingly, the fact that the introductory language

46

banning both practices is identical -- suggests the two causes of action should be interpreted to have the same scope.

Reading these two clauses in the same way is reinforced by the fact that both causes of action were motivated by a unitary purpose. "Section 43(a) of the Lanham Act creates a 'federal cause of action for unfair competition.'" Optimum Techs, Inc., 496 F.3d at 1247-48 (quoting Univ. of Fla. v. KPB, Inc., 89 F.3d 773, 775 (11th Cir. 1996) (per curiam)); see 15 U.S.C. § 1127 (noting that one of the purposes of the Act is "to protect persons engaged in . . . commerce against unfair competition"); S. Rep. No. 79-1333, at 4 (1946), reprinted in 1946 U.S.C.C.A.N. 1274, 1275 ("There is no essential difference between trade-mark infringement and what is loosely called unfair competition. Unfair competition is the genus of which trade-mark infringement is one of the species . . . ."). Both its trademark protections and its prohibition on false advertising are "part of the broader law of unfair competition that has its sources in English common law." Moseley v. V Secret Catalogue, Inc., 537 U.S. 418, 428 (2003) (citation omitted); see Natural Answers, Inc. v. SmithKline Beecham Corp., 529 F.3d 1325, 1330-31 (11th Cir. 2008) ("The intent of [the false advertising] provision is to protect 'commercial interests [that] have been harmed by a competitor's false advertising, and [to secure] to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have

not.'" (second and third alterations in original) (quoting Phoenix of Broward, Inc. v. McDonald's Corp., 489 F.3d 1156, 1168 (11th Cir. 2007))).

The Supreme Court has clarified that the principles underlying the Lanham Act contemplate liability that extends beyond direct violators of the trademark provision of § 43(a). Inwood Labs., Inc., 456 U.S. at 853; see William R. Warner & Co., 265 U.S. at 530 ("The [defendant manufacturer's] wrong was in designedly enabling the dealers to palm off the [drug] as that of the [plaintiff]."). Because these same principles motivated the false advertising provision, the same reasoning supports the conclusion that a plaintiff can state a claim for contributory false advertising. As the Third Circuit has explained in addressing whether claims based on agency and apparent agency are cognizable under § 43(a) of the Lanham Act:

> The contributory infringement cases . . . demonstrate that in certain instances, secondary, indirect liability is a legitimate basis for liability under the federal unfair competition statute. There is a good reason for this: the Lanham Act is derived generally and purposefully from the common law tort of unfair competition, and its language parallels the protections afforded by state common law and statutory torts. . . . In construing the Act, then, courts routinely have recognized the propriety of examining basic tort liability concepts to determine the scope of liability.

Am. Tel. & Tel. Co., 42 F.3d at 1433.

Moreover, while the two causes of action are derived from the same principles and contained in the same statute, the Supreme Court has recognized that the false advertising provision of the Lanham Act entails broader protections.

48

See POM Wonderful LLC v. Coca-Cola Co., 134 S. Ct. 2228, 2234 (2014) ("The Lanham Act's trademark provisions are the primary means of achieving [the statute's] ends. But the Act also creates a federal remedy [for false advertising] 'that goes beyond trademark protection.' The broader remedy is at issue here." (quoting Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 29 (2003)). It would be odd indeed for us to narrow the scope of the false advertising provision -- a cause of action plainly intended to encompass a broader spectrum of protection -- and hold that it could be enforced only against a smaller class of defendants. Absent congressional direction, we are reluctant to limit the statute's scope in this way. Thus, we hold that a plaintiff may bring a claim for contributory false advertising under § 43(a) of the Lanham Act.

What, then, must a plaintiff establish in order to state a contributory false advertising claim? First, the plaintiff must show that a third party in fact directly engaged in false advertising that injured the plaintiff. Second, the plaintiff must allege that the defendant contributed to that conduct either by knowingly inducing or causing the conduct, or by materially participating in it.

In order to establish that a third party engaged in false advertising, the plaintiff "must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the . . . misrepresentations."

Lexmark Int'l, Inc., 134 S. Ct. at 1395. To prove that the third party's statements

caused the requisite injury, we have held that the plaintiff must show:

> (1) the . . . statements were false or misleading; (2) the statements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on the consumers' purchasing decision; (4) the misrepresented service affects interstate commerce; and (5) [the plaintiff] has been, or likely will be, injured as a result of the false or misleading statement.

Sovereign Military Hospitaller Order v. Fla. Priory of Knights Hospitallers, 702

F.3d 1279, 1294 (11th Cir. 2012).

The Lanham Act's false advertising provision allows a plaintiff to base its

claim not only on statements that are literally false, but also on statements that are

misleading when considered in their full context. Osmose, Inc. v. Viance, LLC,

612 F.3d 1298, 1308 (11th Cir. 2010). Although "[s]tatements of opinion are

generally not actionable" under the Lanham Act, id. at 1311, we have suggested

that we will treat a statement framed as an opinion as one of fact if it "fairly

implies a [factual] basis." See id. (citing Restatement (Third) of Unfair

Competition § 3 cmt. d. (1995) ("Some representations of opinion may imply the

existence of facts that justify the opinion . . . .")).

Once the plaintiff establishes the elements of a direct false advertising claim

against a third party, it must allege that the defendant contributed to that conduct.

This means that the plaintiff must allege that the defendant had the necessary state

of mind -- in other words that it "intended to participate in" or "actually knew

about" the false advertising. See Mini Maid Servs. Co., 967 F.2d at 1522. The plaintiff must also allege that the defendant actively and materially furthered the unlawful conduct -- either by inducing it, causing it, or in some other way working to bring it about. Cf. 1-800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d 1229, 1249 (10th Cir. 2013) (explaining that Inwood establishes liability for a defendant who "enables a third party" to violate the Lanham Act).

Analogies from trademark infringement, in which contributory liability is more developed, can be instructive. Thus, for example, a plaintiff may be able to make out the participation prong of a contributory false advertising claim by alleging that the defendant directly controlled or monitored the third party's false advertising. See Perfect 10, Inc. v. Visa Int'l Serv. Ass'n, 494 F.3d 788, 807 (9th Cir. 2007). It is also conceivable that there could be circumstances under which the provision of a necessary product or service, without which the false advertising would not be possible, could support a theory of contributory liability. See Inwood Labs., Inc., 456 U.S. at 854-55. In determining whether a plaintiff has adequately alleged facts to support such a claim, we look to whether the complaint suggests a plausible inference of knowing or intentional participation, examining "the nature and extent of the communication" between the third party and the defendant regarding the false advertising; "whether or not the [defendant] explicitly or implicitly encouraged" the false advertising; whether the false advertising "is

51

serious and widespread," making it more likely that the defendant "kn[ew] about and condone[d] the acts"; and whether the defendant engaged in "bad faith refusal to exercise a clear contractual power to halt" the false advertising. See Mini Maid Servs. Co., 967 F.2d at 1522.

The district court identified four allegedly false claims in the complaint, each of which was made by a duty free operator to representatives of an airport and each of which DFA says we should attribute to Estée Lauder. First, Nuance stated in a letter to Atlanta officials: "Given that Estée Lauder brands account for 20% of cosmetic and fragrance sales, at least in Orlando, and cosmetic and fragrance sales constitute one of the largest sources of revenue for duty free stores, a lack of access to Estée Lauder brands would cast doubt on the validity of DFA's projected revenue streams." Second, Travel Retail told Orlando officials: "[W]e strongly believe that Estée Lauder is a product which you have to sell, also, to domestic passengers." Third, Nuance said during the Orlando appeal hearing: "With respect to DFA, I'd like to echo Travel Retail's concerns on DFA's rents. . . . DFA sales project[ions] are deemed to be unreasonable and not sustainable in light of the history." Finally, Travel Retail informed the Orlando Airport Authority: "[F]ailure to offer the Estée Lauder product line will negatively impact duty free and duty

paid sales revenue for both international and domestic travelers."[7] DFA argues

that it also alleged that Nuance, in its letter protesting the Atlanta award, stated

"DFA may have made misrepresentations about its ability to carry Estée Lauder

brands,"[8] and we agree that this is an allegedly false claim the district court failed

to consider.

As for the first element, Estée Lauder claims that the duty free operators did

not engage in any false advertising. Estée Lauder urges us to hold that DFA's

complaint is devoid of any false or misleading statements cognizable under the

Lanham Act, but we need not answer this fact-intensive question. We agree that

DFA did not adequately allege Estée Lauder contributed to any of the statements,

and thus affirm the district court's dismissal on this ground.

We are unable to find in DFA's complaint any facts that would enable the

court to draw the reasonable inference that Estée Lauder induced or knowingly or

intentionally participated in any of the allegedly false statements made by the other

duty free operators. In its complaint, DFA based its claim for contributory liability

---

[7] DFA argues that the district court ought not to have considered these quotes, but should have credited the complaint's formulations, specifically (1) "carrying [Estée Lauder] products is required for the success of a duty free store" and (2) "DFA's lack of access to [Estée Lauder] products will prevent it from being successful, including being able to meet its projected revenue targets." DFA's summarized false statements are indistinguishable from the quotations in substance. And its claim fares no better if they are substituted for the actual statements that the operators made to airport authorities.

[8] DFA again argues that we must consider its preferred formulation: "DFA did not have the ability to sell the [Estée Lauder] products it had listed in its [Atlanta] bid." The substitution of this phrasing would be similarly immaterial.

on the fact that "[Estée Lauder] knew or should have known of the False Claims, but [it] continued to supply [Estée Lauder] product[s] to its favored duty free operators . . . . In doing so, [Estée Lauder] provided its favored duty free operators with the means to continue making the False Claims . . . ." We cannot see how the mere sale of Estée Lauder products can serve as a basis for holding the manufacturer liable for any disparaging statements its customers make in the course of their own separate business relations. In our view, selling Estée Lauder products is too unrelated to the making of the allegedly false or misleading statements to form a basis for liability -- under either an inducement or participation theory.

Moreover, contrary to DFA's argument, there are simply no facts in the complaint that suggest the existence of coordinated action or encouragement, much less inducement, between Estée Lauder and the operators on the decision to make the disputed claims to airport authorities. There has been no allegation that by selling its products to the duty free operators, Estée Lauder monitored, controlled, or participated in operators' statements to airport authorities during a competitive bidding process for which Estée Lauder was not even present. More generally, there are no facts to suggest that Estée Lauder commonly exercises any level of control over or involvement in the duty free operators' conduct during airport RFP bidding.

In short, although we agree with DFA that a plaintiff may state a claim against a defendant for contributory false advertising, we are unwilling to extend the doctrine as far as DFA urges. The mere sale of products in the course of an ordinary business relationship, without more, cannot justify a finding that a defendant induced, encouraged, caused, procured, or brought about false advertising. Contributory false advertising claims are cognizable under the Lanham Act, but a plaintiff must allege more than an ordinary business relationship between the defendant and the direct false advertiser in order to plausibly plead its claim. DFA has failed to do so here.

V.

DFA's final claim is that Estée Lauder's direct and indirect involvement in airport RFP processes violated Florida's prohibition against tortious interference with a prospective business relationship. Under Florida law, "[t]he elements of tortious interference with a business relationship are '(1) the existence of a business relationship[;] (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship.'" Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So. 2d 812, 814 (Fla. 1994) (alteration adopted) (quoting Tamiami Trail Tours, Inc. v. Cotton, 463 So. 2d 1126, 1127 (Fla. 1985) (per curiam)). Though the second and fourth

55

elements of this test are self-explanatory, the first and third require some additional explication.

As for the first element -- the existence of a business relationship -- the Supreme Court of Florida has explained that the plaintiff need not allege the existence of an enforceable contract and that the plaintiff can prevail "if the jury finds that an understanding between the parties would have been completed had the defendant not interfered." Id. (quoting Landry v. Hornstein, 462 So. 2d 844, 846 (Fla. Dist. Ct. App. 1985)). "A mere offer to sell, however, does not, by itself, give rise to sufficient legal rights to support a claim of intentional interference with a business relationship." Id. (quoting Landry, 462 So. 2d at 846).

The third element, intentional and unjustified interference with a business relationship, requires the plaintiff to allege that "the defendant acted without justification." Sec. Title Guarantee Corp. of Balt. v. McDill Columbus Corp., 543 So. 2d 852, 855 (Fla. Dist. Ct. App. 1989). This is a fact-intensive inquiry that requires "an examination of the defendant's conduct, its motive, and the interests it sought to advance." Id. (quotation omitted). Importantly, however, Florida recognizes a "privilege of interference." Wackenhut Corp. v. Maimone, 389 So. 2d 656, 657-58 (Fla. Dist. Ct. App. 1980). This means that where "there is no contract right to have the relation continued, but only an expectancy[,] . . . a competitor has the privilege of interference in order to acquire the business for

56

himself." Id.; accord Greenberg v. Mount Sinai Med. Ctr. of Greater Miami, Inc., 629 So. 2d 252, 255 (Fla. Dist. Ct. App. 1993).

"If a defendant interferes with a contract in order to safeguard a preexisting economic interest of his own, the defendant's right to protect his own established economic interest outweighs the plaintiff's right to be free of interference, and his actions are usually recognized as privileged and nonactionable." See Heavener, Ogier Servs., Inc. v. R.W. Fla. Region, Inc., 418 So. 2d 1074, 1076-77 (Fla. Dist. Ct. App. 1982); Sec. Title Guarantee Corp. of Balt., 543 So. 2d at 855 (noting that, as "long as improper means are not employed, activities taken to safeguard or promote [a company's] own financial interests are entirely non-actionable." (quotation and alteration omitted)).[9]  Indeed, Florida courts have explained that, even if the plaintiff has an existing, terminable-at-will contract, the defendant's interference to protect its economic interests is privileged unless the plaintiff

---

[9] Florida's Standard Jury Instructions, though merely persuasive, also confirm our understanding of Florida law.  They read, in relevant part:

> A person who interferes with the business relations of another with the motive and purpose, at least in part, to advance [or protect] his own business [or financial] interests, does not interfere with an improper motive.  But one who interferes only out of spite, or to do injury to others, or for other bad motive, has no justification, and his interference is improper.  So also, a person who interferes with another's business relations using ordinary business methods [of competition] does not interfere by an improper method. But one who uses [physical violence], [misrepresentations], [illegal conduct], [threats of illegal conduct], [or] [(identify other improper conduct)] has no privilege to use those methods, and his interference using such methods is improper.

Standard Jury Instructions-Civil Cases (99-1), 778 So. 2d 264, 269 (Fla. 2000) (footnotes omitted).

57

alleges "a purely malicious motive" divorced from any "legitimate competitive economic interest." See Heavener, Ogier Servs., Inc., 418 So. 2d at 1077. It follows that where the plaintiff alleges only a prospective business relationship -- and thus the plaintiff has a "mere expectancy" of a new relationship -- the privilege of interference similarly bars only interference consisting of malicious conduct. Cf. id. at 1077.

Interpreting Florida law, we have said that "when there is room for different views" about the propriety of a defendant's interference with a plaintiff's business relationships, "the determination of whether the interference was improper or not is ordinarily left to the jury." Mfg. Research Corp. v. Greenlee Tool Co., 693 F.2d 1037, 1040 (11th Cir. 1982) (quotation omitted). However, when plaintiffs have failed to adequately allege improper methods, we have followed the Florida courts and dismissed these claims. See, e.g., Int'l Sales & Serv., Inc. v. Austral Insulated Prods., Inc., 262 F.3d 1152, 1159 n.1 (11th Cir. 2001); Royal Typewriter Co., a Div. of Litton Bus. Sys. v. Xerographic Supplies Corp., 719 F.2d 1092, 1104-05 (11th Cir. 1983); see also Seminole Tribe of Fla. v. Times Pub. Co., 780 So. 2d 310, 318 (Fla. Dist. Ct. App. 2001) (affirming district court's grant of defendant's motion to dismiss tortious interference claim).

DFA urges us to find that it adequately alleged improper methods in its complaint, citing to three allegations about Estée Lauder's conduct: (1) Estée

58

Lauder represented to airport authorities that DFA could not meet its financial projections; (2) Estée Lauder represented to the Atlanta Airport Authority that DFA was unable to sell any Estée Lauder products, implying that DFA did not have outstanding inventory; and (3) Estée Lauder suggested to airport authorities that DFA was not a quality operator.

As we see it, the problem with each of these allegations is the same: the complaint does not allege that Estée Lauder actually made any of these statements. To be sure, false statements made "for the purpose of harming [a competitor's] economic interests" can in some instances form the basis of a claim for tortious interference. Londono v. Turkey Creek, Inc., 609 So. 2d 14, 18-19 (Fla. 1992). But DFA does not allege that Estée Lauder ever expressed an opinion on DFA's financial projections or its inventory, much less that it conveyed that opinion to any airport officials. As for the third statement -- that DFA was not a quality operator -- DFA asks us to infer this opinion from a letter in which Estée Lauder vouched for the quality of other duty free operators. In our view, this is not a reasonable inference from Estée Lauder's statement. That Estée Lauder is satisfied with the quality of its named business partners cannot be read to implicitly disparage the quality of all other unmentioned entities in the same industry. DFA was not referenced at all in the disputed letter to Newark airport officials, and we

are unwilling to read this silence to make any comment on the quality of DFA's work.

DFA also cites language from its complaint that Estée Lauder "encourag[ed] or induc[ed]" other duty free operators to make misrepresentations to airport authorities. We agree that if the complaint adequately alleged inducement, this might be sufficient to state a claim under Florida law. But DFA was required to provide more than "'a formulaic recitation of the elements'" of its tortious interference claim. Simpson, 744 F.3d at 708 (quoting Twombly, 550 U.S. at 555). It was obliged to support its allegation with facts from which a reasonable trier of fact could infer inducement or encouragement by Estée Lauder. We are unable to find any facts of this kind in DFA's complaint. No facts in the complaint plausibly suggest that Estée Lauder asked or encouraged any duty free operator to discuss DFA with airport authorities. All that the complaint establishes is that Estée Lauder sold its products to the operators, provided them with truthful information about its market share, and vouched for the quality of their work. These facts are entirely unrelated to inducement, and for that reason are insufficient to raise DFA's claim from possible to plausible.

Moreover, even if we were to agree with DFA that its bare and wholly conclusory statements that Estée Lauder induced or encouraged the duty free operators were sufficient to survive a motion to dismiss, we would still conclude

60

that the complaint is devoid of any allegations of impropriety. Florida law is clear that the privilege of interference encompasses actions taken to protect a company's economic interests as long as the methods employed were not improper. Sec. Title Guarantee Corp. of Balt., 543 So. 2d at 855; Heavener, Ogier Servs., Inc., 418 So. 2d at 1076-77. DFA does not allege that any of its competitors took action for the sole purpose of interfering with DFA's prospective relationships with airport authorities. To the contrary, as DFA acknowledges, each duty free operator was attempting to procure the same airport contract for itself. Taking the complaint in the light most favorable to DFA, two of its competitors disparaged its sales projections and business practices during the competitive bidding processes for both the Orlando International Airport and the Hartsfield-Jackson Atlanta International Airport. DFA does not allege that its competitors entered the competition pretextually, solely for the purpose of harming DFA's prospective interests. Moreover, there are simply no facts from which we can infer that the statements were made out of any motivation other than the hope of winning the airport contract. Accordingly, we affirm the dismissal of the tortious interference claim.

## VI.

In sum, DFA failed to allege a critical element of each of its three claims against Estée Lauder. Accordingly, we AFFIRM.